Chris W. HENRY, Trustee in Bankruptcy for Midwest Battery, Inc., Appellee and Cross-Appellant,

v.

CHLORIDE, INC., a Delaware Corporation, Appellant and Cross-Appellee.

Nos. 85–2394, 85–2446.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1986.

Decided Jan. 20, 1987.

Rehearing and Rehearing En Banc Denied Feb. 26, 1987.

---

**1336**

Chris S. Courtroulis, Tampa, Fla., for appellant and cross-appellee.

John M. Kilroy, Jr., Kansas City, Mo., for appellee and cross-appellant.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and LARSON,* Senior District Judge.

ARNOLD, Circuit Judge.

Both sides appeal in this complicated case, which involves the Robinson-Patman Act § 2(a), 15 U.S.C. § 13(a), and the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, as well as the Missouri law of contracts and tortious interference. The defendant, Chloride, Inc., appeals from a $600,000 Robinson-Patman judgment in favor of plaintiff Midwest Battery Co. (now in bankruptcy and represented by its trustee), which claims it was driven out of business by defendant's illegal price discrimination. A jury award to plaintiff of $100,000 for breach of contract also is appealed by Chloride, as is the District Court's grant of plaintiff's motion for judgment notwithstanding the verdict, vacating the defendant's $50,000 award for trademark violations by Midwest. Finally, Midwest appeals the defendant's award of $200,000 in compensatory and punitive damages for plaintiff's tortious interference with Chloride's contracts with its salesmen. We reverse the antitrust verdict and remand that claim for a new trial. We also reverse Chloride's award for tortious interference. We affirm the District Court's decision to set aside Chloride's verdict for trademark infringement. We also affirm Midwest's

verdict for breach of contract. The net result is that Midwest will recover a $100,000 judgment against Chloride on the contract claim, and that the antitrust claim will be tried again.[1]

## I.

Midwest was founded in 1964 by Russell Dean, who ran the wholesale battery operation until 1978, when because of illness he turned control over to his son, John.[2] Much of Midwest's business was in automotive batteries, sold to jobbers, such as auto parts stores; smaller dealers, such as service stations; manufacturers, who placed the batteries in original equipment; and a few individuals. Tr. at II:21–22. Although the company had been modestly successful from the outset, the mid–1970's brought setbacks from two sources. First, the company lost its high-profit industrial battery business, leading to losses in 1976 and 1977. Tr. at II:20–21. Second, an increasing number of dealer accounts, which tended to purchase only a few batteries at a time, switched to buying their batteries from route trucks. Described by Mr. Dean as "kind of inventory on wheels," *id.* at 22–23, a route-truck system not only brings the product to the customer, but the driver/salesperson also offers more individual service than the customer might receive at the warehouse. Routes could be operated either by employees of the distributor or by independent operators who worked closely with the distributor. The latter were referred to as f.o.b. salesmen.

To improve its position, Midwest in 1979 joined Battery Specialists of America (BSA), a buying group, and therefore was able to pay considerably less for the batteries it purchased. At about the same time, Mr. Dean also set up a successful company

---

\* The Hon. Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation. The writer of this opinion acknowledges the substantial assistance of Judge Larson in its preparation.

1. If, on remand, Midwest again recovers a judgment against Chloride on its antitrust claim, the judgment on the contract claim will have to be credited against it. We agree with the District

Court that the contract and antitrust claims are duplicative, both designed to compensate Midwest for its going out of business. Midwest cannot recover on both theories.

2. John Dean had purchased the company from his father by the time the critical events in this lawsuit had occurred; therefore, any references in this opinion to "Mr. Dean" are to the son.

route in Wichita, Kansas, followed by others in Topeka and Kansas City, Kansas and Kansas City, Missouri. Although Midwest primarily sold Gould batteries, Mr. Dean was interested in offering Chloride batteries also because of their customer acceptance and more complete product line. In March 1980, therefore, Mr. Dean met with John Kossow, a Chloride account executive, about purchasing unbranded Chloride batteries through BSA. An unbranded battery does not carry the manufacturer's name or warranty and is sold to the distributor at a commensurately lower price than the maker's branded product. Chloride itself sold batteries in the Kansas City area through a branch office and its route trucks. Mr. Dean testified that when he asked about competing with the Chloride branch, Mr. Kossow said, " 'I don't get any credit for what that branch sells,' " and " 'the branch and you will be able to work well together.' " Tr. at II:99.

In late March, Midwest ordered and later received 800–plus unbranded Chloride batteries. By May, however, the defendant was refusing to fill a second order from Midwest and never again sold batteries to Midwest. Three circumstances appear to be key to Chloride's decision to cut off Midwest, their relative importance depending on who tells the story. Midwest did proceed to compete vigorously with Chloride in the sale of Chloride-made batteries. Second, at the end of April, three of the defendant's f.o.b. salesmen, as well as the route sales supervisor—who together accounted for 60 per cent. of the branch's sales—defected to Midwest without notice to the defendant. The supervisor, a former branch manager, also took confidential Chloride materials with him to his new position. Finally, Midwest sold the defendant's unbranded product with a label that included the notation, "BATTERIES BY CHLORIDE."

Midwest continued to compete with Chloride after the defendant's refusal to sell additional batteries, although the distributor's ambitious plans for expansion were gradually scaled down. There was considerable price-cutting, and by the end of fiscal 1980 Midwest had lost $85,000, compared to a profit of $14,000 in January 1980. Tr. at II:188. Despite the fact that Midwest's sales and gross profits increased over the next several years, its losses also grew. In June 1982, Midwest filed this lawsuit against Chloride, and 18 months later it declared bankruptcy.

The case was heard by a jury over a three-week period. Midwest claimed the defendant violated the Robinson-Patman Act by engaging in illegal price discrimination; broke the contract to supply Midwest with batteries through BSA; and fraudulently misrepresented to plaintiff its position on Midwest's competition with the Kansas City branch. By counterclaim, Chloride alleged violation by Midwest of federal trademark law, as well as tortious interference by plaintiff with Chloride's f.o.b. or route salesmen. Midwest was awarded $200,000 on the antitrust claim and $100,000 on the contract claim, which the Court found to be duplicative of the Robinson-Patman award. Chloride was awarded $100,000 in actual damages on its tortious-interference claim, another $100,000 in punitive damages, and $50,000 for trademark infringement.

The District Court upheld and trebled the Robinson-Patman damages and awarded plaintiff $302,130 in attorneys' fees, considerably less than its request for $1,248,505.30.[3] The Court also upheld the tortious-interference and contract awards, but granted Midwest's motion for judgment n.o.v. on Chloride's trademark award. This appeal followed, in which each party challenges the other's victories.

---

**3.** Because of our decision reversing the Robinson-Patman verdict, plaintiff's counsel is not yet entitled to attorney's fees under the Clayton Act, and we need not consider its appeal of the District Court's fee award. In addition, since Chloride's tort recovery is to be reversed outright, it is not necessary to consider the propriety of offsetting it against any antitrust damages the bankrupt Midwest may recover in the future.

## II.

Chloride challenges the Robinson-Patman award to Midwest as both incorrect as a matter of law and without evidentiary support. We look first at defendant's claim on the Act's requirement of injury to competition and then to its contention that plaintiff's alternative theory based on alleged predatory pricing is also without merit.

> Under the Robinson-Patman Act, it is unlawful for any person engaged in commerce ... to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.[4]

The jury in this case was told to consider "whether the effect of price discrimination [by Chloride] 'may have been substantially to lessen competition in a line of commerce, or to injure, prevent or destroy competition between Midwest and Chloride in the Kansas City market.'" Instruction No. 29, Tr. at XV:46. Although "you cannot infer ... such competitive injury from the mere fact that Chloride may have obtained more business ... as the result of these [discriminatory] sales and that some of this business may have come from Midwest," nevertheless, the District Court told the jurors:

> Midwest is not required to show that competition in the market was in fact injured or lessened. It is only necessary to show a violation of the Robinson-Patman Act for Midwest to establish that the discriminatory sales created a reason-

able possibility of injury to competition, *or to a competitor.*

Instruction No. 29, Tr. at XV:47–48 (emphasis added).

Chloride objected to the charge when given, and also made the charge a basis of its motion for either a judgment n.o.v. or a new trial, on the ground that the Robinson-Patman Act protects competition in general and does not prohibit price discrimination which simply injures a single competitor. "[A]lthough the courts are apparently in dispute on this issue," the District Court said, it found injury to competition between Midwest and Chloride alone sufficient under the Act to support a verdict for plaintiff. Memorandum opinion at 19 (W.D.Mo. Oct. 8, 1985). The Court said it understood the intent of Congress, in amending Section 2 of the Clayton Act with the Robinson-Patman Act, "to deal with 'the immediately important concern [of] injury to the competitor victimized by the discrimination.'" *Ibid., citing* S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936). Moreover, the Court noted, the effects instruction was limited by its further directions on predatory intent. *Id.* at 19–20. See *infra* at 1343 n. 8.

We look first to the words of the statute, which forbids price discrimination that might "injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination." It has been argued that this phrasing, limited as it is to competition, in and of itself rules out injury to a competitor as a basis for Robinson-Patman liability.[5] We disagree, and acknowledge that the language of the statute, viewed alone, could make illegal those price cuts which do no more than injure a competitor, as well as those harmful to competition in general. But this is not a statute which

---

4. The Supreme Court has interpreted price discrimination under the Robinson-Patman Act to mean any price difference unrelated to quality. *FTC v. Anheuser-Busch, Inc.,* 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). No question is raised on appeal about the existence of such discrimination.

5. A study by the Attorney General's Committee emphasized the fact that the words of the statute

expressly forbid injury only to competition and not competitors; therefore, a focus on individual competitors and not "the health of the competitive process literally go[es] beyond the terms in the law." Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), *quoted in* E. Kintner, *A Robinson-Patman Primer* 118 (2d ed. 1979).

can be studied in a vacuum. Rather, it is necessary to consider the Robinson-Patman Act in light of its complicated legislative history, its relationship to the body of anti-trust law to which it is, however morganat-ically, wed, and the way it has been inter-preted over the past half-century.

The evil addressed in the Sherman Act was the big trust, which could swallow up or drive out smaller businesses and charge monopoly prices. The villain of Robinson-Patman was the big chain store, which could command low prices from manufac-turers, thereby undercutting smaller enter-prises and bypassing wholesale distribu-tors. The Clayton Act, as originally draft-ed in 1914, did prohibit price discrimination tending to injure competition, but the stat-ute also exempted those price differences based on grade, quantity, or quality, limit-ing its use against powerful buyers. De-spite the Supreme Court's statement to the contrary, *George Van Camp & Sons Co. v. American Can Co.*, 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311 (1929), there was wide-spread belief that the Act as it stood could not protect smaller competitors against the chain stores' buying power. See generally F. Rowe, *Price Discrimination Under the Robinson-Patman Act* 3–11 (1962).

Robinson-Patman represented the Con-gressional response to the situation facing smaller businesses and distributors; in fact, the Act was drafted by the general counsel of the United States Wholesale Grocers Association. See generally Han-sen, *Robinson-Patman Law: A Review and Analysis*, 51 Fordham L.Rev. 1113, 1119–24 (1983). The District Court and plaintiff in this case correctly note the con-cern for individual competitors evidenced in the legislative reports and debates over the Act. For example, the Senate report cited by the District Court here in support of the proposition that the statute's first "concern is an injury to the competitor" goes on to say that "[o]nly through such [individual] injuries ... can the larger general injury [to competition] result, and to catch the weed in the seed will keep it from coming to flower." S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936), *reprinted in* E. Kintner, *Legislative History of the Antitrust Laws* 3012, 3015 (1978).

What Midwest does not face, however, is the issue of which individual competitors the framers of Robinson-Patman were con-cerned with. The same Senate report and that issued by the House Committee de-nounce almost exclusively the practices of "certain large buyers" and "large buyer customers." *Id.* at 7, 3017; H.R.Rep. No. 2287, Pt. 1, 74th Cong., 2d Sess. 15 (1936), *reprinted in* Kintner, *Legislative History* 3181, 3193. There is no doubt that the focus of this legislation was on what is called secondary-line competition—that be-tween the customers of the price-discrimi-nating seller [6]—and not primary-line com-petition, which is between the discrimina-ting seller and others offering the same goods.

Nevertheless, the Congressional solici-tude for rivals of the chain stores was not limited to individual secondary-line competi-tors, but was "engrafted onto the Clayton Antitrust Act governing pricing in all of American industry." Rowe, *supra* at 22. In fact, the opponents of the Act in the House criticized the bill on the very ground that it would "apply to effects on competi-tion in a community or upon a store in a community" and that it would "deal with allegations that specific stores had been injured or hampered in competing with their rivals." H.R.Rep. No. 2287, Pt. 2, 74th Cong., 2d Sess. 11, 23 (1936) (minority views), *reprinted in* Kintner, *Legislative History* 3197, 3205, 3215. This unsuccess-ful argument was made despite Rep. Wright Patman's statement in debate that

---

6. Rep. Patman, describing the bill's purpose in debate, said Congress was "attempting to stop": a policy in business that a few rich, powerful organizations by reason of their size and their ability to coerce and intimidate manufactur-ers have forced those manufacturers to give them their goods at a lower price than they give to the independent merchants under the same and similar circumstance and for the same quantities of goods. 80 Cong.Rec. 8111, *reprinted in* Kintner, *Legisla-tive History*, at 3265.

this legislation "is not a bill that will shelter the independent merchants of this country." 80 Cong.Rec. 8111, *reprinted in* Kintner, *Legislative History*, at 3264.

Therefore, "the legislative history of the 1936 amendments and the literal language of Section 2(a) both furnish some support for the view that the effects proviso is satisfied simply by a showing that the discriminatory price injured a competitor," E. Kintner & J. Bauer, 3 *Kintner: Federal Antitrust Law* 255 (1983) (footnote omitted); *but see id.* at 255, 261. And while no Supreme Court case has dealt directly with the injury-to-a-competitor question, the only one arguably to touch on the issue does seem to support Midwest's position in the present case. In *FTC v. Morton Salt Co.*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), quoting the same Senate report language cited by the District Court here, the Court noted that Robinson-Patman developed from a belief that the Clayton Act's emphasis on injury to competition was overly restrictive and that the focus of the new Section 2 was on the injured competitor. *Id.* at 49, 68 S.Ct. at 829. Nevertheless, *Morton Salt* is not strong support for plaintiff's argument. First, it deals with the classic secondary-line scenario of injury to rivals of big chain-store buyers, and not with the competitors of the discriminating seller. Second, despite its use of the "weed in the seed" language, *id.* at 49–50 and n. 18, 68 S.Ct. at 829–830 and n. 18, the opinion ultimately speaks of how well the FTC demonstrated injury to *competition* as a general matter. *Id.* at 50, 51, 68 S.Ct. at 830. These are among the reasons why, as a former FTC chairman and general counsel has noted, "[f]or the most part, [*Morton Salt*'s] suggestion that injury to competitors is the focal point of the competitive-effects requirement has been rejected by both the commission and the courts." E. Kintner, *A Robinson-Patman Primer* 117 (2d ed. 1979); see also F. Rowe, *Price Discrimination* 127–32 (1962).

■ Only a very few courts have adopted the notion that injury to an individual competitor alone makes out a Robinson-Patman claim. See, *e.g.*, *FLM Collision Parts, Inc. v. Ford Motor Co.*, 406 F.Supp. 224, 237 (S.D.N.Y.1975) (semble), *rev'd on other grounds*, 543 F.2d 1019 (2d Cir.1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Castlegate, Inc. v. National Tea Co.*, 34 F.R.D. 221, 230 (D.Colo.1963). The courts of appeals that have considered this issue (as most of them have), have overwhelmingly held that "[t]he naked demonstration of injury to a specific competitor without more is not sufficient to show that a price discrimination 'may' substantially lessen competition." *Foremost Pro Color v. Eastman Kodak Co.*, 703 F.2d 534, 548 (9th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). See also *Motive Parts Warehouse v. Facet Enterprises*, 774 F.2d 380, 395 (10th Cir.1985); *D.E. Rogers Associates, Inc. v. Gardner-Denver Co.*, 718 F.2d 1431, 1439 (6th Cir.1983), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 721 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Lloyd A. Fry Roofing Co. v. FTC*, 371 F.2d 277, 281 (7th Cir.1967); *Standard Motor Products, Inc. v. FTC*, 265 F.2d 674, 676 (2d Cir.1959), *cert. denied*, 361 U.S. 826, 80 S.Ct. 73, 4 L.Ed.2d 69 (1961). The Federal Trade Commission also has long said that "it is not enough simply to establish that individual sellers have been injured, or that some competitors have left the market." *International Telephone & Telegraph Corp.*, 3 Trade Reg.Rep. (CCH) ¶ 22,188 at 23,095 (July 25, 1984) (footnote omitted); see also *In re Purex*, 51 F.T.C. 100, 112 (1954); FTC Policy Toward Geographic Pricing Practices, CCH Trade Reg. Rep. (10th ed.), pp. 5341, 5348 (Oct. 12, 1948), *quoted in* Rowe, *Price Discrimination* 127.

Support for the position taken by the courts and FTC comes from the Act's original preoccupation with secondary, rather than primary competition, as well as the fact that the words of the statute do emphasize competition rather than competitors, permitting but not requiring the pro-

tection of individuals harmed by price discrimination. But at the heart of these cases is the sense that " '[a] focus on detrimental effects *on competition,* rather than a concern with individual *competitors,* is fundamental to a reconciliation of the Robinson-Patman Act with overall antitrust policies.' " *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 347 (3d Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982) (emphasis in original), *quoting* Rowe, *Price Discrimination* 130. Injury to a single competitor, even in conjunction with price discrimination, can represent "honest competition" as much as "illegal conduct," *D.E. Rogers Associates,* 718 F.2d at 1439, or even mismanagement or inefficiency by the injured competitor. *International Telephone & Telegraph Corp.,* 3 Trade Reg.Rep. at 23,095. We agree. The Supreme Court has made clear the primacy of general pro-competitive principles in interpreting and applying all of the antitrust laws. *Automatic Canteen Co. v. FTC,* 346 U.S. 61, 73–74, 73 S.Ct. 1017, 1024–25, 97 L.Ed. 1454 (1953). To allow recovery to an individual competitor who has been injured by what might be legitimate competitive pricing would turn the Robinson-Patman Act into a font of tort law for battered businesses.

Rather than permit this, courts have reconciled the Act's protectionist undercurrent with antitrust's pro-competitive goals by requiring plaintiffs to meet Section 2(a)'s injury requirement in one of two ways: either show substantial possibility of injury to competition by market analysis, or show injury to a competitor, accompanied by predatory intent. See, *e.g., International Air Industries,* 517 F.2d at 722 & n. 14; *Lloyd A. Fry Roofing,* 371 F.2d at 281; Rowe, *Price Discrimination* 130. The asserted rationale behind this scheme is that while injury to a competitor may result from honest competition (encouraged under the antitrust laws), this same honest competition is compromised when a market par-

ticipant acts with the intention of destroying its competitors. See *infra* at 1344.

We hold, therefore, that the jury in this case was improperly instructed on the critical issue of competitive injury under the Robinson-Patman Act. Another panel of this Court has recently come to the same conclusion. *Richard Short Oil Co. v. Texaco, Inc.,* 799 F.2d 415, 420 (8th Cir.1986) (alternative holding).

It follows that the verdict for Midwest on its Robinson-Patman claim cannot stand. The possibility remains that Midwest presented sufficient evidence to justify such a verdict under correct legal principles, in which event Midwest would be entitled to a new trial on this claim. But if Midwest's evidence was legally insufficient on any correct legal basis, then Chloride should have received a judgment n.o.v. To this question we now turn.

### III.

■ Midwest argues that even if injury to a single competitor is insufficient under the Act, there was in this case injury to competition in a line of commerce if the relevant market is defined as "route sales of replacement batteries on one or more routes within a 200–mile radius of Kansas City, Missouri." Appellee's brief at 12. Since Midwest and Chloride were apparently the only real participants in such a market in certain cities,[7] plaintiff claims its demise represented injury to competition generally. Because we are reviewing a jury verdict, we must consider the evidence in the light most favorable to the plaintiff, the verdict-winner. We may order a judgment n.o.v. only if no rational jury could have found for plaintiff. This means, in the context of the present appeal, that judgment n.o.v. is proper only if no rational jury could have found the relevant market to be the rather narrow submarket for which plaintiff contends. For if the relevant product market in fact is limited to route sales, there was sufficient evidence

---

**7.** Midwest's expert testified, "The route is a market. If that is right then Midwest was a major

competitor." Tr. at X:48.

of injury to competition (not just injury to a competitor) to justify a rational, properly instructed jury in finding for plaintiff.

Market definition depends on interchangeability—"how different from one another are the [products] in character and use"—and cross-elasticity—"how far buyers will go to substitute one commodity for another." *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956) (the Cellophane case); see also *Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237, 1241 (8th Cir.1973) ("availability of reasonable substitutes was the significant factor" in *DuPont*). Plaintiff agrees that the batteries sold by route salespersons are not different in character, creation, or use from those sold from a warehouse or store, Appellee's brief at 13 n. 12. It claims instead that route sales fall squarely into the concept of a "well-defined submarket[ ]" for antitrust purposes, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). As described in *Brown Shoe*, such a submarket may be identified by industry or public recognition of its separate character, special uses or characteristics or production facilities, distinct customers or prices, price sensitivity, and specialized vendors. *Ibid.* Route sales, Midwest argues, represent distinct customers—lowervolume retailers—who prefer this method of buying, which involves both special prices and specialized sellers.

There was testimony that automotive replacement battery sales fell into several distinct categories, including route sales to smaller retail outlets (primarily service stations), large volume sales to battery specialists through fixed branch locations, and direct mass merchandising through retail outlets such as Sears or K–Mart. Tr. at VII:98–99, 105–07; Tr. at XII:191–94. Midwest presented evidence that route sales met many of the *Brown Shoe* indicia of a separate submarket: the industry recognized route sales as a separate entity, routes served distinct customers, distinct prices existed on the routes, there was a lack of sensitivity to price changes, and

there were specialized vendors. See *Brown Shoe Co. v. United States, supra,* 370 U.S. at 325, 82 S.Ct. at 1523. The evidence of each of these factors is reviewed briefly below.

First, it is undisputed that route sales involved specialized vendors: customers relied upon the route salesperson's expertise in selecting batteries and in other aspects of the business, and the vendors would bring a variety of batteries to customers in a specially equipped truck once a week. Tr. at VII:98–100, 105–07. Customers had a great deal of loyalty to individual route salesmen, who prided themselves on their relationships with their customers. Tr. at VII:233–34; Tr. at X:126; Tr. at V:173. Route sales were directed to a particular type of customer: the small service-station owner who sells only a few batteries a week and who "needs some advice and maybe some help on moving his product." Tr. at VII:107; Tr. at II:23–24.

Chloride charged route customers prices different from those for sales through its fixed branch location, and plaintiff's expert witness, Dr. Leonard White, testified that the cross-elasticities of demand were very low, leading him to conclude that the route was the relevant market. Route distribution customers did not shift readily to other sources of batteries in response to price changes. Tr. at X:46–48, 113–15. In fact, plaintiff presented extensive evidence of price differences between route sales and other sales and among the routes themselves. See generally Tr. at X:12–51.

Finally, plaintiff presented evidence that the industry itself viewed route sales as a separate market. Jack DeWeese, Chloride's Kansas City branch manager, prepared a report in April, 1981, entitled "Competitive Report on Kansas City Branch # 41," which was based exclusively on a route distribution analysis. Tr. at VII:193–97; Pl.Ex. 13. This report emphasized that while there were other companies involved in the route truck business in the area, Midwest represented Chloride's only real competition. Pl.Ex. 13. In ex-

plaining his report at trial, DeWeese testified that

> it was common knowledge that we were able to compete with Interstate because they have known weaknesses, i.e. in most areas their service was lax at this time. They appeared to cover a very large area with only one and perhaps two trucks.

> Allied was not really interested in the route type business. The only person that really was in competition, major competition to us on the route business in the areas we serviced was Midwest.

Tr. at VII:197. The DeWeese report mentions "Midwest's major advantages over Chloride" as its "5%–10% price advantage" and the fact that as a small, local company it was able to "react quicker than Chloride." Pl.Ex. 13. The report mentions nothing about competition from other sources, such as large retail outlets, and DeWeese at trial stated: "We weren't really competing for the retail markets." Tr. at VII:194.

To be sure, there was testimony by defendant's expert that route truck operators could not raise their price above a certain level or mass merchandisers would enter the market, see Tr. at XII:193–94, but the jury did not have to accept this evidence. Moreover, such evidence does not automatically preclude finding a separate market. See Tr. at X:115. For example, in *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), a case decided after *du Pont*, the Supreme Court held that central-station alarm systems constituted a separate submarket from other protection devices even though the central-alarm-system sellers did not "have unfettered power to control the price of their services ... due to the fringe competition of other alarm or watchman services." *Id.*

at 574, 86 S.Ct. at 1705. See *United States v. Alcoa (Rome)*, 377 U.S. 271, 275, 84 S.Ct. 1283, 1286, 12 L.Ed.2d 314 (1964); *Superturf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir.1981); *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 30 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

In this case, the District Court instructed the jury to consider the relevant market in determining whether competition had been injured. Instruction 28, Tr. at XV:44–46. While there is evidence from which a jury could find the relevant market to be as Chloride contends, we believe there was sufficient evidence for a jury to find a narrower market as well. Because Midwest presented evidence that it was a very substantial if not Chloride's only real competitor in the route-distribution market, Midwest's evidence was legally sufficient to establish injury to competition. See *Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 902–03 (3d Cir.1985). We are therefore unable to rule out Midwest's Robinson-Patman claim as a matter of law on this appeal.

### B.

Plaintiff might also recover under the Robinson-Patman Act on retrial if it were able to show the defendant acted with predatory intent. Chloride argues, however, that a jury properly instructed on the question of predatory intent could not have found it liable for illegal price discrimination.[8] Because the antitrust claim is to be tried again, we discuss this alternate theory for the guidance of the District Court on remand.

---

8. Instruction No. 29, Tr. at XV:46, defined predatory intent as the "purpose ... to injure Midwest or any other of Chloride's competitors." This only circles back to the injury-to-a-single-competitor standard and is inadequate in light of our decisions, see, *e.g., Conoco, Inc. v. Inman Oil Co.*, 774 F.2d 895, 904–05 n. 6 (8th Cir.1985), as well as *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, — U.S. —, 106 S.Ct. 1348,

89 L.Ed.2d 538 (1986), see *infra* at 1344–45, particularly since it would also permit a finding of predatory intent (and by inference, injury to competition) without any showing of the price discriminator's ability to lessen competition in the market as a whole. On remand, the predatory-intent instruction should be changed to conform with the standards set forth in this opinion.

### 1.

As we said above, *supra* at 1341, two ways have been developed to prove a primary-line Robinson-Patman violation: either directly by market analysis showing injury to competition, or by inference from injury to the plaintiff-competitor accompanied by defendant's predatory intent, the logic for the latter method being that "an illicit intent accentuates the probability that a prohibited consequence will come to pass." Rowe, *Price Discrimination* 144. There have been, in turn, two ways to demonstrate predatory intent: expressly, from statements, documents, and the like, or implicitly, usually from defendant's conduct, such as below-cost or unprofitable pricing for extended periods and unfair business practices, but also from circumstantial factors, such as defendant's relative size, entry barriers, etc. See generally J. Von Kalinowski, 3 *Antitrust Trade Laws and Trade Regulation* § 10.03[3] (1986). The use of implicit evidence has been called a double inference, since indirect evidence is used to infer predatory intent, which is then used to infer the Act's requisite injury to competition. An example of the use of these factors is the decision in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). In that Robinson-Patman case, the Supreme Court upheld a jury verdict for plaintiff where defendants had persistently priced below "direct cost plus an allocation for overhead," *id.* at 698, 87 S.Ct. at 1334, and had participated in industrial espionage against plaintiff.

Since *Utah Pie*, there has been an explosion of academic and judicial discussion of the concept of predatory practices, triggered in large part by the publication of Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975). The authors stated that predation cannot exist unless the price-cutter has some expectation of recouping its losses by raising prices once competition is eliminated. Therefore, only that conduct which permanently eliminates efficient competitors and prohibits new competitors from entering the market should be prohibited. As a dividing line between competitive and predatory practices, they suggested that pricing at or above marginal cost (the cost of producing an additional unit of output) represents conduct which would not drive equally efficient rivals from the market. *Id.* at 709–16. Since marginal cost is difficult to ascertain, the authors offered as a reasonable proxy average variable cost, which represents the total of those costs (such as wages or raw materials) that vary with output, divided by output.

Although Areeda and Turner's formulation has been criticized and refined by scholars, see Von Kalinowski, 3 *Antitrust Laws* at § 10.02[3], and courts, *id.* at § 10.03[5], there has been growing consensus on one point—that the issue of "predatory intent" should focus on what the defendant did and on whether it could lead to the evil feared, since non-predatory price cuts are to be encouraged under the antitrust laws. Courts have therefore gradually limited the concept of predatory intent as desire to harm and replaced it with "a set of objective economic conditions that allow the court to 'infer' improper intent." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir.1983). This Court is among those that have recognized the hazards of using evidence of desire to prevail competitively to forecast economic harm. "[E]ven in the presence of direct evidence of intent, we think a separate showing of predatory or anticompetitive conduct is necessary. Evidence of intent alone can be ambiguous or misleading." *Conoco, Inc. v. Inman Oil Co.*, 774 F.2d 895, 904 n. 6 (8th Cir.1985); see also *Trace X Chemical, Inc. v. Canadian Industries Ltd.*, 738 F.2d 261, 268 (8th Cir. 1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).

Last term, the Supreme Court, in its first statement on predatory pricing since *Utah Pie*, gave its imprimatur to this notion of the search for predatory practices as a rational-conduct inquiry. In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986) (decided after the trial in this case), the Court noted that "predatory pricing schemes are rarely tried, and even more rarely successful," *id.* 106 S.Ct. at 1357–58, because they require both the acquisition and maintenance of a noncompetitive position. The opinion repeatedly discusses a defendant's plausible or rational motives in acting, *id.* at 1361, 1362, referring not to its desire (or even plan) to hurt its rival, but to its objective ability both to eliminate this competitor and keep others from filling the void. In essence, *Matsushita* imports a rule of impossibility into predatory pricing cases: if the defendant could not have captured the market, its conduct cannot be predatory, no matter what its "intent." [9]

Midwest could argue—as it does of certain other predatory pricing cases—that *Matsushita* was decided under the Sherman Act and not the Robinson-Patman Act [10], and is therefore inapplicable here. Numerous courts, however, have held that the same "economically plausible" predatory-price analysis applies equally to the attempted-monopoly provision of Section 2 of the Sherman Act and to primary-line cases under the Robinson-Patman Act. *D.E. Rogers Associates, Inc. v. Gardner-Denver Co.,* 718 F.2d 1431, 1434, 1439–40 (6th Cir.1983), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1041 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982);

*International Telephone & Telegraph Corp.,* 3 Trade Reg.Rep. (CCH) ¶ 22,188 (July 25, 1984); see also Areeda & Turner, *Predatory Pricing,* 88 Harv.L.Rev. at 727–28; E. Kintner & J. Bauer, 3 *Kintner: Federal Antitrust Law* 280 n. 143. It is true that the Sherman Act speaks of attempt to monopolize, while Robinson-Patman is aimed at lessening of competition; nevertheless, in order to lessen competition, a defendant must be able to create a real possibility of both driving out a rival by loss-creating price cutting and then holding on to that advantage to recoup losses; in other words, the price-cutter must be able at least to threaten domination of the market. If the price-cutter cannot dominate—if other rivals can with reasonable ease take the place of any competitors knocked out—competition is not seriously or permanently damaged.

Accepting rational economic conduct as the standard for predation and pricing as a lodestar for measuring that conduct is only a first step. Although most courts have considered average variable cost (AVC) a significant boundary, there has been some debate about the consequences of falling above or below that line. We noted without elaboration in *Super-Turf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1281 (8th Cir.1981), that while a monopolist's above-variable-cost pricing could be predatory, in general prices between average variable and average total cost were

---

**9.** During cross-examination counsel for Midwest asked defendant's expert witness, "Do you agree predatory intent can exist but not be successful?" Tr. at XIII:125. The thrust of *Matsushita* is that while predatory intentions need not be accomplished, there must be some reasonable expectation on the part of the alleged predator that it will succeed in dominating, if not controlling, the market. Another comment from this trial is instructive here. A comparison was made between predatory competition and the shoving, "if intentional," of Mary Decker by Zola Budd in the 1984 Olympics. Tr. at X:20. Under *Matsushita,* Ms. Budd would have acted predatorily only if she had some plausible expectation that she could indeed win a medal (although she need not actually have won one, as she did not).

**10.** Plaintiffs in *Matsushita* brought suit under Sections 1 and 2 of the Sherman Act, as well as the Robinson-Patman Act. The District Court granted summary judgment in defendant's favor on the Section 1 allegation and dismissed the other claims as based on the same insufficient evidence. The Court of Appeals reversed. While *Matsushita* is primarily a Section 1 case, the general principles set out are not limited to cases brought under that statute. 106 S.Ct. at 1355 nn. 8 & 9. The Supreme Court described predatory pricing as a "term ... used chiefly in cases in which a single firm, having a dominant share of its market, cuts its price in order to force competitors out of the market, or perhaps to deter potential entrants from coming in." *Id.* n. 8 (citations omitted).

" 'competitive and socially optimal.' " (Citation omitted). One court has held prices above AVC conclusively legitimate and those below conclusively predatory, *Northeastern Telephone Co. v. AT & T*, 651 F.2d 76, 88 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). The Ninth Circuit places the burden on defendant to justify below-AVC pricing, on the plaintiff to challenge above–AVC pricing, and also permits some prices above average total cost to be found predatory. *William Inglis & Sons Baking Co.*, 668 F.2d at 1034–36. Another court rejects the Ninth Circuit's average-total-cost exception and would make prices above that line conclusively legal, *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 233–36 (1st Cir.1983), as would the Federal Trade Commission, *International Telephone & Telegraph Corp.*, 3 Trade Reg.Rep. (CCH) ¶ 22,188 at 23,081–83 (July 25, 1984). Under the FTC analysis,[11] sales at or above AVC would be "strongly, often conclusively" presumed legal, *id.* at 23,082; those below AVC for a significant time period rebuttably presumed predatory, *ibid.* We agree with *Barry Wright Corp.* that at some point, competitors should know for certain they are pricing legally, and that this point should be average total cost. In other words, prices above average total cost are legal *per se*. However, we also believe that "rigid adherence to a particular cost-based rule," *William Inglis & Sons Baking Co.*, 668 F.2d at 1035, can produce injustice, and therefore hold AVC to be a marker of rebuttable presumptions, with the plaintiff holding the burden above and the defendant below.[12]

**11.** In *International Telephone & Telegraph*, the FTC suggested that the ideal rule would require both predatory intent (that is, sales below AVC for a significant period of time) and predatory conduct (that is, sales at prices which over a significant time period will force out equally efficient competitors). 3 Trade Reg.Rep. (CCH) at 23,081. This seems only to restate the rational-economic-conduct rule by redefining "intent" to mean conduct, and "conduct" to mean possibility.

### 2.

Midwest offered both direct and indirect evidence that Chloride acted predatorily in the Kansas City market. The direct evidence consisted of statements by Chloride's regional manager about the supervisor and route salesmen who defected to plaintiff's employ, including, " 'If you go, fine, but, ... we are going to make sure you all don't make it [at Midwest],' " Tr. at V:122. He also voiced his intention to see that one former route salesman "would be back in a company truck and [the former supervisor] would be back on a bulldozer." Tr. at VII:184. There were also allegations that Chloride management decided not to "put certain things in writing" about Midwest. Tr. at VII:78.

In addition, both sides presented extensive expert economic evidence on the question whether Chloride engaged in predatory pricing. Predictably, each expert criticized the other's methodology and conclusions. Testifying for Midwest was Dr. Leonard White, a professor of economics at the University of Arkansas and specialist in applied price theory. He concluded that Chloride's Kansas City branch priced below cost in 1980, and that the pricing was attributable not to supply and demand but to predatory intent. Pl.Ex. 134. He noted that Chloride's Kansas City branch operated in May 1980 at a gross-profit loss and at either a loss or minor profit from 1980 to 1982, which "clearly put them below full cost over an extended period," Tr. at X:23, and was in marked contrast to the profits made in other Chloride branches. In addition, he said, the branch's level of profitability rose considerably in 1984.

**12.** In *Matsushita*, the Supreme Court declined to determine what "appropriate measure of cost," 106 S.Ct. at 1355 n. 8, constitutes predatory pricing. The Court said it would not "consider whether recovery should *ever* be available ... when the pricing in question is above some measure of incremental cost," but added that "[a]s a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational businesses would not enter into conspiracies such as this one." 106 S.Ct. at 1355 n. 9 (emphasis in original.)

By working with Chloride invoices and individual battery sales, Dr. White determined a range for Chloride's AVC for batteries in 1980, which he placed at transfer price (the cost of the battery before its shipment to the branch) plus between five and nine dollars for the additional variable costs. Tr. at X:31–33. Of 9,571 battery transactions examined, Dr. White found 22 below transfer cost, 26 less than transfer cost plus two dollars, and 142 less than transfer cost plus between two and five dollars, *id.* at 32–33; these low prices accounted for up to 14.67 per cent. of all invoices and 18 per cent. of company invoices, *id.* at 35. These prices were clearly below total cost, said Dr. White, and were below AVC part of the time. Moreover, he argued that extended over a period of time, AVC comes to be total cost, *id.* at 10–12, and therefore Chloride's below-total-cost pricing was suspect as well. On cross-examination, Dr. White acknowledged that the Kansas City branch had been less profitable than others prior to 1980, and that its sales as well as its profits decreased in the 1980–1984 period. *Id.* at 163–65. He also agreed that by his figures, the total price cut by Chloride below transfer price amounted to a $528 difference, but added that to Midwest, this represented the loss of approximately 150 battery sales. *Id.* at 181.

Defendant's expert, Dr. Seth Norton, challenged Dr. White's methodology as "decidedly inferior," Tr. at XIII:52, to the regression analysis he used. Dr. Norton, an assistant professor of marketing in business economics at Washington University, challenged some expense elements included as variable costs in the plaintiff's analysis and concluded that Chloride had not priced predatorily. He did testify that under his own analysis, 11 per cent. of Chloride's prices were significantly lower than others without a corresponding quantity difference, Tr. at XII:186, and that there was a five-to-six month period in 1980 when company prices were significantly higher than the route-sale prices, Tr. at XIII:104. But he also noted that he found only 12 of 6,841 battery transactions sold below AVC, representing .175 per cent. of the batteries sold by the branch, *id.* at 31–32, that the average battery price was AVC plus $12, *id.* at 73, and that therefore the branch prices were above AVC "in the overwhelming number of cases." *Id.* at 28–29. His conclusion that Chloride did not price predatorily was also based on Chloride's small, relatively static share of the entire Kansas City market—according to his estimate, an average of 2.12 per cent. in the period from 1980 to 1984—as well as its declining sales. It would be "very difficult for a low market share to successfully engage in predatory pricing[,] ... [b]ecause it would have to drive out a lot of rivals," Dr. Norton said, Tr. at XII:204. "[I]f predatory pricing were in fact going on here, ... this market share would rise and rise precipitously." *Id.* at 210.

■ After viewing this evidence in the light most favorable to plaintiff, we hold that the jury could reasonably have inferred predatory conduct, as we have previously explained the legal meaning of that term. At an AVC of transfer price plus $9, on the routes where the parties were in direct competition, Chloride priced below AVC 30.97 per cent. of sales in Wichita; 14.17 per cent. in south Kansas City; 22.61 per cent. in Kansas City; and 18.49 per cent. in Topeka. Appellee's brief at 19 n. 19. These calculations represent what Dr. White himself described as "the high end of any [AVC] argument you could make," Tr. at X:33, and refer to route sales only, but, as we have held, the jury could have found route sales to be a relevant product submarket.

If, as we have held, "predatory intent" for this purpose requires some reasonable possibility of success, definition of the relevant market becomes crucial, for "success" takes on meaning only in light of that definition. In the instant case, expert witnesses on both sides presented coherent theories, based on actual economic data, of relevant market and of below-cost pricing. Had we sat on the jury, we might well have found defendant's expert more convincing. But we are not triers of fact. We are

appellate judges and must act with great restraint when reviewing a jury verdict. We hold that a rational jury could have found for plaintiff either on an injury-to-competition theory, or on an injury-to-a-competitor-plus-predatory-intent theory. On remand, both these theories of recovery may be presented to the jury under proper instructions.[13]

## IV.

Chloride also challenges the jury's award to Midwest of $100,000 in damages on plaintiff's claim that defendant's refusal to sell it any additional batteries was a violation of the BSA–Chloride agreement. The District Court denied defendant's motion for a new trial or judgment n.o.v., and Chloride made essentially the same argument there as it does before this Court—that there was no enforceable agreement requiring it to sell batteries to Midwest. We disagree and affirm the District Court's decision.

The 1979 agreement between BSA and Chloride was verbal, unlimited in duration, and terminable at will by either party. Under the arrangement, BSA members could purchase Chloride batteries through the organization at a substantial savings over the cost to them as individual purchasers. The batteries were shipped directly to members, but BSA was the official customer. The manufacturer billed the organization, which then collected from the purchasing member. Chloride did ship Midwest's initial order of approximately 800 batteries but, in a decision Midwest learned of only from its customers, the defendant refused to honor plaintiff's second order and never sold to Midwest again.

The defendant argues that Midwest could not enforce the Chloride–BSA buying arrangement because the contract as a whole lacked the critical element of mutuality. Since no BSA member was required to purchase a single battery from it, defendant says, the agreement was "a contract which depends for performance upon the will, wish or pleasure of one of the parties [and therefore] is unenforceable." *M.J.S. Resources, Inc. v. Circle G. Coal Co.*, 506 F.Supp. 341, 347 (E.D.Mo.1980).

■ It is clear, however, that mutuality is not such a rigid concept. *Vigano v. Wylain, Inc.*, 633 F.2d 522, 526 (8th Cir. 1980) (mutuality exists in contract where defendant agrees to sell its products as ordered by plaintiff " 'from time to time' "). Moreover, Chloride's claim that it obtained no benefit from this arrangement with BSA is simply unrealistic. The right to solicit BSA members as customers, defendant says, was "already available to Chloride and the inescapable fact remains that BSA members had no concomitant obligation to Chloride." Appellant's reply brief at 24 n. 9. Chloride's reasoning here ignores critical aspects of the BSA contract: the agreement gave defendant a single contact with a large number of smaller buyers like Midwest, who without the buying power of the organization might be unable to afford Chloride products. Perhaps more important is the fact that the structure of sales under the agreement—shipping to the member, but charging the organization—gave Chloride both more streamlined methods of billing and more certainty that such bills would be paid. We consider this benefit to Chloride sufficient to make this contract enforceable.

There was no limitation in the BSA–Chloride agreement on which members could take advantage of the arrangement, except for those battery specialists located too far from Chloride distribution points. Nor was there a provision allowing Chloride to refuse to ship to any BSA member, although

---

**13.** Chloride also urges us to order judgment n.o.v. in its favor on the ground that the evidence of causation was legally insufficient. We disagree. There was enough evidence to establish the fact of injury. After that, the extent of damages may be ascertained on the basis of reasonable inferences.

We observe, in addition, that on retrial Chloride may again assert the meeting-competition defense. We find no error in the District Court's instructions describing this defense.

a later agreement between the two permitted the manufacturer to do so based on valid business reasons,[14] but not including competition with Chloride. As a BSA member, Midwest was a third-party beneficiary of this enforceable 1979 contract; Chloride could have cancelled the entire agreement with BSA and renegotiated it to exclude Midwest or set conditions on members' sale of batteries. However, it could not refuse to supply one BSA member and consider the agreement still in force. The $100,000 award in Midwest's favor is affirmed.

## V.

The District Court granted Midwest's motion for judgment notwithstanding the verdict on the jury's $50,000 award to Chloride for its trademark-infringement counterclaim. Although "it is apparent that plaintiff's unauthorized use of defendant's name on the otherwise unbranded batteries was 'wrongful' and that the public could believe that defendant 'sponsored or otherwise approved plaintiff's use of the trademark,' " the Court went on to say that it was "persuaded by the line of authority which indicates that a seller of genuine goods that bear the trademark of the manufacturer of those goods," Memorandum op. at 14, violates neither Section 32 nor Section 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125. The defendant appeals and argues that the District Court incorrectly interpreted the applicable law. We affirm the District Court's decision, although on somewhat different grounds.

Separate opinions by Mr. Justice Holmes make up the heart of each party's argument. Chloride cites *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), for the proposition that Midwest's labels violated trademark law. In *A. Bourjois*, the plaintiff was the American holder of a French face-powder company's registered marks; however, rather than use the French firm's packaging, the

plaintiff imported the powder in bulk and used its own boxes. The defendant bought the original product in French boxes and sold them in this country. Justice Holmes rejected defendant's argument that she merely sold accurately labelled goods bearing the French firm's trademark; in the United States, he said, the trademark is plaintiff's and its use of it "stakes the reputation of the plaintiff upon the character of the goods." *Id.* at 692, 43 S.Ct. at 245.

Midwest, in turn, suggests that the controlling case is *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924), in which the plaintiff Coty challenged the use of its name on defendant's pressed powder, which was sold in a metal compact and made up in part of Coty's loose face powder. Here, the Supreme Court held that so long as the public is not deceived, "we see no ... sanctity in the [trademark] as to prevent its being used to tell the truth," *id.* at 368, 44 S.Ct. at 351, and so approved defendant's use of the word "Coty" when accompanied by specific disclaimers about plaintiff's relationship to the actual finished product. This, Midwest says, shows it did not "infringe the trade name 'Chloride' by identifying unlabelled, genuine batteries manufactured by Chloride as being 'by Chloride.' " Appellee's brief at 31.

The District Court relied on a series of recent cases dealing with the unauthorized sale of a manufacturer's genuine goods bearing the manufacturer's trademark. In those cases, however, unlike the present one, not only were the goods genuine products of the manufacturer, but so were the trademarks. See, *e.g., DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621, 622 n. 1 (2d Cir.1980) ("no reproduction, counterfeit, copy, or colorable imitation of the [manufacturer's] mark"); *El Greco Leather Products Co. v. Shoe World Inc.*, 599 F.Supp. 1380, 1392 (E.D.N.Y.1984) (goods "were completed and labelled with [plain-

---

**14.** Chloride also argues that the District Court's refusal to instruct the jury on defendant's justification as a defense to the contract claim requires us to reverse the award. However, since we have rejected as actionable those aspects of Midwest's conduct to which Chloride refers— see *infra* at 1350–52—the refusal to instruct, if error, was harmless.

tiff's] mark with plaintiff's permission"); see also *Puritan Sportswear Corp. v. Shure*, 307 F.Supp. 377, 389–90 (W.D.Pa. 1969); *Burlington Mills Corp. v. Roy Fabrics, Inc.*, 91 F.Supp. 39, 47 (S.D.N.Y.), aff'd, 182 F.2d 1020 (2d Cir.1950). The proposition for which these cases stand is that a manufacturer cannot rescind its genuine trademark on its genuine goods, absent, for example, tainting of the product by mishandling, *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F.Supp. 131, 135–36 (D.Colo.1980), or licensing agreements limiting its sale past a certain date, *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 154 (3d Cir.1984).

We return to an analysis of the Holmes opinions. It seems that *A. Bourjois* is inapt here, for it deals with a plaintiff's mark placed on another company's goods. The "boxes and powder [we]re the genuine product of the French concern," 260 U.S. at 691, 43 S.Ct. at 245, but the trademark identifying the product belonged to the American firm. *Prestonettes* is closer to the current situation, for it deals with goods which are genuine and a mark which accurately describes those goods. Chloride argues that the restrictions placed by the Court on the use of the Coty mark mean that absent a similarly detailed disclaimer on the batteries, Midwest infringed defendant's mark. Although this argument is plausible, we think it goes too far. The disclaimer in *Prestonettes*, except for the statement that defendant was "not connected with Coty," dealt entirely with the fact that the product had been changed by defendant, and how that change was effected. 264 U.S. at 367, 44 S.Ct. at 351. Other cases requiring disclaimers with the use of plaintiff's mark also involve products which have been altered in some way. *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130, 67 S.Ct. 1136, 1139, 91

L.Ed. 1386 (1947); *Bulova Watch Co. v. Allerton Co.*, 328 F.2d 20, 23 (7th Cir.1964).

■ There is no suggestion here that the batteries were altered, as in *Prestonettes* or *Bulova Watch*, or that they were "seconds" of inferior quality, as in *Burlington Mills Corp.*, or that they were not Chloride batteries, as in a classic "passing off" case. We think, therefore, that the principle of disclaimer was sufficiently served in this case. The label stated in large letters covering half the available space that the product was from "MIDWEST BATTERIES." Midwest's address was below its name in somewhat smaller letters, and in the lower right-hand corner, in still smaller letters, "BATTERIES BY CHLORIDE." While this would truthfully tell the customer which company manufactured the battery, we think it unlikely that a customer would assume that the concern which warranted the battery was the one with the little letters tucked in the corner. This is not to say that Midwest was entitled to replicate the Chloride label in toto and place it on the unbranded battery. But had Chloride wished to prevent the use of its name in any form on its unaltered, first-quality product, it could have contracted for that very arrangement.[15] We hold, therefore, that the judgment n.o.v. in Midwest's favor on Chloride's claim for trademark infringement was properly granted.

## VI.

In addition to trademark infringement, Chloride's counterclaim alleged that Midwest tortiously interfered with defendant's relationship with three f.o.b. salesmen named Price, Gaikowski, and Reuter. The three ended one day's work representing Chloride and, without notice, started the next day calling on the same customers for Midwest. The jury found for Chloride and awarded it $100,000 in compensatory and $100,000 in punitive damages. The District

**15.** The cases cited by the District Court, ante at 1350, are useful here. In none of those cases did plaintiff contract with defendant concerning forbidden avenues of distribution, a fact of crucial significance to the deciding courts. See, e.g., *El Greco Leather Products Co. v. Shoe*

*World Inc.*, 599 F.Supp. 1380, 1391–92 (E.D.N.Y. 1984). Compare *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 154 (3d Cir.1984), where the sale of trademarked goods after expiration of a licensing agreement was found to be trademark infringement.

Court denied plaintiff's motion for a judgment notwithstanding the verdict, and Midwest appeals on the ground that Chloride failed to prove tortious interference. We agree, and reverse.

Under Missouri law, a party alleging tortious interference must show: the existence of a contract or valid business relationship or expectation; the interferer's knowledge of that relationship; intentional interference which induces the breach; the absence of justification for the interference; and damages, *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, 315 (Mo.1979) (en banc). One justification recognized by Missouri courts is that of valid competition between business rivals, as long as that competition meets the standards for appropriate conduct established in Section 768 of the Restatement [2d] of Torts. *Briner Electric Co. v. Sachs Electric Co.*, 680 S.W.2d 737, 741 (Mo.App.1984); see also *Conoco Inc. v. Inman Oil Co.*, 774 F.2d 895, 907 (8th Cir.1985). Section 768 states that interference with a prospective or "at will" contract is not improper if:

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

Comment (e) to Section 768 describes "wrongful means" as "physical violence, fraud, civil suits and criminal prosecutions," but not "persuasion" or even "limited economic pressure" and refusals to deal. Elaborating, the comment draws the line between proper and improper interference by condemning a rival's "exer[tion of] a superior power in affairs unrelated to their competition." As one Missouri court described Section 768, "[i]n essence the rule states that competitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations." *Briner Electric*, 680 S.W.2d at 741; see also *Conoco Oil*, 774 F.2d at 907.

■ We believe that Midwest's conduct falls on the proper side of this line. The route men had no contractual obligations to Chloride for any particular period of time (at least one had previously contacted Jack Dean about working for Midwest before going to defendant), and Chloride failed to show that any unlawful means were used to lure the trio to Midwest. It may be true, as Chloride argues, that Jerry Reike, its former supervisor, appropriated trade secrets when he took Chloride papers with him to his new job at Midwest. But no claim was made for tortious interference with the Reike-Chloride relationship, and no showing was made that the three route men were induced by Reike's actions.[16]

None of the other conduct cited by Chloride even arguably represents wrongful means.[17] We are unpersuaded by its claim that the parameters set out in *Briner Electric* are "merely ... *examples*," Appellant's reply brief at 31 (emphasis in original). Had the *Briner Electric* court meant its description of wrongful means to be an example, it could have said "for example" (or even, "for instance") and not "[i]n essence." 680 S.W.2d at 741. See also *Conoco*, 774 F.2d at 907. For that reason, we also must reject failure to give notice upon leaving a job as sufficient improper means under Section 768. Lack of notice to an employer may represent a breach of manners, E. Post, *Emily Post's Etiquette* 576 (14th ed. 1984) (two weeks' notice appropri-

---

**16.** We have held that Midwest did not violate the Lanham Act by putting Chloride's name on its labels. *Ante,* Pt. V. Even if we had reinstated that verdict in Chloride's favor, however, there was no showing that the labels (rather than a better financial deal) induced the defection to Midwest.

**17.** We have considered and find unpersuasive Chloride's suggestion that conduct which might not represent tortious interference becomes actionable when a large proportion of a plaintiff's work force is hired away by a defendant.

ate, or one month for management); it is not a tort. See *Briner Electric,* 680 S.W.2d at 743 ("these acts, while perhaps unsporting, do not rise to the level of wrongfulness").

Chloride also argues that the wrongful means of Section 768 need not have induced the breach alleged. This claim misreads the law. Chloride states that Section 768 does no more than require the presence in the air of some "wrongful means" to make out a claim for tortious interference, ignoring the title to Comment (e) on the clause—"Means of inducement." It also quotes *Downey v. United Weatherproofing, Inc.,* 363 Mo. 852, 253 S.W.2d 976 (1953), the case in which Missouri embraced the modern concept of tortious interference, for the proposition that proof of improper means of inducement is "non-essential to a recovery." 363 Mo. at 859, 253 S.W.2d at 981. What the Missouri Supreme Court actually said, however, was that proof of fraud, deceit, or coercion as inducement was "non-essential ... *if* ... there is alleged (and demonstrated) that the alleged wrongdoer maliciously, that is, with knowledge of the contract and without justifiable cause, induced the breach." *Ibid.* Chloride has failed to meet its burden of proving absence of justification, and the verdict in its favor must be reversed.

## VII.

In conclusion, we hold that Chloride is entitled to a new trial on the Robinson-Patman Act claim, but that it did break an enforceable agreement of which Midwest was a beneficiary. We also hold that Midwest did not violate the Lanham Act, nor did it tortiously interfere with Chloride's business expectations. The tortious-interference and Lanham Act claims are accordingly dismissed. The antitrust claim is remanded for a new trial. The breach-of-contract judgment for $100,000 is affirmed, but this amount must be credited against any recovery Midwest may obtain as a result of the new trial on its claim of violation of the Robinson-Patman Act. Each side will bear its own costs on this appeal.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

LARSON, Senior District Judge, concurring.

I fully concur in the majority opinion rulings on the breach of contract, trademark infringement and tortious interference with contract claims. I write separately to express my views on plaintiff Midwest's Robinson-Patman Act claim.

Beginning in 1979 and early 1980, Midwest, a small local company, entered into competition with Chloride, a large national battery manufacturer, in the route distribution sales of automotive replacement batteries. Chloride viewed Midwest as its only real competitor in the areas in which they competed, and, according to the evidence presented by Midwest, Chloride responded to Midwest's competition with a cut-off of battery sales to Midwest through the buying group Battery Specialists of America (even though it continued to sell to BSA for delivery to other BSA members), with threats to Midwest's f.o.b. sales force that Chloride would "give batteries away" if that's what it took and would "make sure you all don't make it [at Midwest]," and with targeted price decreases in the form of sales below both average total cost and average variable cost. Although initially Midwest's route sales were successful, Chloride's campaign took its toll and Midwest eventually was forced to declare bankruptcy. Shortly thereafter, Chloride revised its prices upward, and the profitability of Chloride's Kansas City branch rose considerably in 1984.

I believe that Chloride's alleged territorial price discrimination lies at the heart of the Clayton Act as amended by the Robinson-Patman Act. *See FTC v. Anheuser-Busch, Inc.,* 363 U.S. 536, 543–44, 80 S.Ct. 1267, 1271–72, 4 L.Ed.2d 1385 (1960); H.R. Rep. No. 627, Pt. 1, 63d Cong., 2d Sess. 8–9 (1914), *reprinted in* 2 E. Kintner, *The Legislative History of the Federal Antitrust Laws and Related Statutes* 1090–91 (1978). Midwest presented evidence that Chloride's

price discrimination injured competition in the route distribution market in the Kansas City area, where plaintiff was a substantial competitor. As caselaw cited by Midwest reveals, "[a] method of product distribution can be considered a relevant submarket for antitrust purposes," *Eastern Dental Corp. v. Isaac Masel Co.*, 502 F.Supp. 1354, 1360 (E.D.Pa.1980), and no rule of law or economic principle bars application of the antitrust laws "to one of several alternative means of distributing a product." *Greyhound Computer Corp. v. IBM Corp.*, 559 F.2d 488, 494 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). *See also Cornwell Quality Tools Co. v. C.T.S. Co.*, 446 F.2d 825, 830 (9th Cir.1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 716, 30 L.Ed.2d 740 (1972).

Midwest also presented proof of the second type of injury cognizable under Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, that is, injury to a competitor coupled with predatory intent. Finding the district court's instructions to be in error with respect to this issue, the majority adopts a cost-based standard for determining predatory intent, and holds further that "conduct cannot be predatory, no matter what its 'intent,'" unless the defendant has the present ability to capture a majority of the relevant market. *Ante* at 1344–46 & n. 8.[1]

While I believe the district court's instructions adequately address the factors relevant to establishing predatory intent,[2] I have no quarrel with the majority's allocation of the burden of proof for determining whether predatory intent may be inferred from a defendant's pricing behavior; namely, that the plaintiff bears the burden when the defendant's prices exceed average variable cost and the defendant bears the burden when they do not. *Ante* at 1346; *see William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1035–46 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). As the *Inglis* Court observed, cost-based inquiries are merely an aid in determining "the ultimate question: Did the justification for the defendant's price depend upon its anticipated destructive effect on competition or was the price justified as a reason-

---

1. The majority also holds that prices above average total cost are legal *per se. Ante* at 1346. Other courts have disagreed. *See Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). Because defendant's counsel conceded at oral argument that Chloride's pricing often was below average total cost, I find no need to reach this question and accordingly express no opinion on the majority's above average total cost ruling. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, — U.S. —, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (reserving question of whether recovery should be available "when the pricing in question is above some measure of incremental cost").

2. The district court's Instruction 29 stated in relevant part:

In considering whether the effect of price discrimination 'may have been substantially to lessen competition ....,' you should consider whether the intent of Chloride in making these price discriminations was predatory. If Chloride's intent was predatory, that is evidence from which you may properly conclude that the discriminatory prices may have had the required adverse effect on competition.

Predatory intent means that its purpose was to injure Midwest or any other of Chloride's competitors. In determining whether Chloride acted with predatory intent, you should consider the following factors: (1) whether the person discriminating in price intended to injure one of its competitors; (2) the relative size of the competitors; (3) whether the price discrimination caused significant economic loss to a competitor; (4) whether discriminatory sales occurred over a long period of time; (5) whether the barriers to entry into the market are high or low, that is, whether new competition could enter the market; (6) whether Chloride's prices, sales or share of the market actually increased appreciably following any price discrimination it may have engaged in; and (7) whether Chloride's pricing was below cost or predatory. Predatory pricing occurs when a firm sells at prices below cost for the purpose of driving competitors out of business with the hope of recouping the losses through subsequent higher prices. Predatory pricing may be deemed to have occurred where the business' prices were, for a significant period of time, below what is called its marginal or average variable cost, or between average variable cost and average total cost. Variable costs are those costs which fluctuate with a firm's output. Total costs are variable costs plus fixed costs.

ably calculated means of maximizing profits, minimizing losses, or achieving some other legitimate end?" *Id.* at 1038.

In my view, however, this case illustrates the need to consider not only average variable cost information, but the totality of the circumstances, including any direct evidence of intent, to properly evaluate whether a plaintiff has proven injury to a competitor coupled with predatory intent. *See generally Transamerica Computer Co. v. IBM Corp.,* 698 F.2d 1377, 1387 & n. 15 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983) and authorities cited therein. In addition to specific evidence of targeted below average variable cost sales, Midwest presented other evidence of predation, including Chloride's breach of contract in refusing to supply unbranded batteries to Midwest and Chloride's increased profitability once Midwest was removed as a competitor, as well as direct evidence of statements by Chloride officials "out to get" Midwest. Moreover, plaintiff's expert witness, Dr. Leonard White, testified that because of Chloride's extended below cost pricing, either total cost or variable cost would be pertinent to determining predation in this case because over the period of time at issue, full cost and variable cost were the same. This evidence, in addition to evidence of specific sales below average variable cost, surely is relevant to plaintiff's predatory pricing allegations.

Finally, while the Supreme Court has focused on whether a defendant is capable of capturing the market in evaluating the credibility of predatory pricing claims, I believe the majority's emphasis on a defendant's "ability to succeed" negates the primary distinction between a Sherman Act claim and a Section 2(a) Robinson-Patman Act claim, and runs directly contrary to Congress' intent both under the Clayton Act and under the Robinson-Patman Amendments. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., supra,* 668 F.2d at 1042; ABA Antitrust Section, Monograph No. 4, *The Robinson-Patman Act: Policy and Law,* Vol. 1 at 25 (1980).

As the Senate report on the original Clayton Act stated:

> Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the Act of July 2, 1890 [the Sherman Act], or other existing antitrust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation.

S.Rep. No. 698, 63d Cong., 2d Sess. 1 (1914), *reprinted in* 2 E. Kintner, *The Legislative History of the Federal Antitrust Laws and Related Statutes* 1744 (1978). *See also* Letter of President Woodrow Wilson to Rep. Oscar W. Underwood, October 17, 1914, *reprinted in* 3 E. Kintner, *supra,* at 2838. The Robinson-Patman amendments extended this concern. H.R.Rep. No. 2287, Pt. 1, 74th Cong., 2d Sess. 8 (1936), *reprinted in* 4 E. Kintner, *supra,* at 3188.

As recently as the mid–1970s, Congress reaffirmed its view that the Robinson-Patman Act reached those injuries caused by price discrimination which fell short of injury to competition generally:

> By nipping in the bud price favoritism, the Robinson-Patman Act is able to forestall eventual Sherman Act difficulties which would likely arise if the price discrimination were permitted to continue.

*Recent Efforts To Amend Or Repeal The Robinson-Patman Act,* 94th Cong., 1st Sess. 41 (1976). In commenting on various proposed amendments which took a more narrow view of predatory intent in primary line cases, the House Subcommittee on Antitrust, the Robinson-Patman Act and Related Matters concluded that these proposed amendments

> would cover only the most egregious practices, which in all likelihood are already prohibited by Section 2 of the Sherman Act. Such a myopic view of predatory practices is at odds with the Clayton Act and, more specifically, the Robinson-

Patman amendments, which are designed to stop such activities before they reach the aggravated state of Sherman Act application.

The predatory price discrimination application of Robinson-Patman reaches those practices which are beyond the scope of the Sherman Act. The proposed revision would emasculate Robinson-Patman in this respect. However, no one has articulated a sound basis for radically limiting the Act's primary line competition reach.

*Id.* at 76.

I have found no persuasive reason for doing so either, and thus, for the reasons described above, while I concur in the result the majority reaches today, I cannot fully endorse the standards it has adopted for judging predatory intent under the Robinson-Patman Act.