LIGGETT GROUP, INC., Plaintiff,

v.

BROWN & WILLIAMSON TOBACCO CORPORATION, Defendant.

Civ. No. C–84–617–D.

United States District Court, M.D. North Carolina, Durham Division.

Aug. 27, 1990.

William H. Hogeland, Bruce Topman, Adam Barker, Webster & Sheffield, Joseph Diamante, Pennie & Edmonds, New York City, C. Allen Foster, Patton, Boggs & Blow, Greensboro, N.C., Josiah S. Murray, III, Durham, N.C., Garrett G. Rasmussen, Patton, Boggs & Blow, Washington, D.C., for plaintiff Liggett Group Inc.

On antitrust brief: William Hogeland, of Webster & Sheffield, New York City; C. Allen Foster, of Patton, Boggs & Blow, Greensboro, N.C.

On trademark brief: Joseph Diamante and Darren W. Saunders, of Pennie & Edmonds, New York City; C. Allen Foster and E. Russell Gaines, III, of Patton, Boggs & Blow, Greensboro, N.C.

Martin London, Andrew J. Peck, Daniel J. Leffell, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Michael L. Robinson, Norwood Robinson, Petree Stockton & Robinson, Winstom–Salem, N.C., for defendant Brown & Williamson Tobacco Corp.

On antitrust briefs: Martin London, Daniel J. Leffell, Julie A. Domonkos and Nathaniel B. Smith, of Paul, Weiss, Rifkind, Wharton & Garrison; Norwood Robinson and Michael L. Robinson of Petree Stockton & Robinson.

On trademark brief: Martin London, Andrew J. Peck, Jennifer S. Conovitz, Jean E. Collins, Rhea N. Schaenman and David M. Schnorrenberg, of Paul, Weiss, Rifkind, Wharton & Garrison; Norwood Robinson and Michael L. Robinson, of Petree Stockton & Robinson.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Liggett Group, Inc., ("Liggett") brought this private antitrust suit to recover treble damages against Brown & Williamson Tobacco Corporation ("B & W") alleging predatory price discrimination in violation of Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a).[1] Liggett also charged that B & W

---

1. The Robinson–Patman Act states in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, ... and where the effect of such discrimination

violated the unfair competition section of the Lanham Trade–Mark Act, 15 U.S.C. § 1125(a),[2] as well as various state common law and statutory unfair trade practices.[3]

After a lengthy trial,[4] the jury returned a verdict in favor of Liggett on the Robinson–Patman Act claim in the amount of $49,600,000.00. When trebled pursuant to 15 U.S.C. § 15(a), Liggett's award totals $148,800,000.00, excluding post-judgment interest and attorneys' fees. The jury found that Brown & Williamson was not liable to Liggett on the trademark and unfair competition claims.

B & W has moved for judgment notwithstanding the verdict (JNOV) under Federal Rule of Civil Procedure 50(b) and, alternatively, for a new trial under Federal Rule of Civil Procedure 59 on the antitrust portion of the case.[5] Liggett has moved for a new trial under Federal Rule of Civil Procedure 59 on its trademark and unfair competition claims. After careful consideration, the court will set aside the antitrust verdict and grant B & W's motion for judgment notwithstanding the verdict. The court will deny B & W's alternative motion for a new trial.[6] Liggett's motion for a

---

may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

2. Section 1125(a) states in relevant part:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

3. Liggett's complaint alleges a statutory claim under the North Carolina unfair trade practices statute, N.C.Gen.Stat. § 75–1 et seq., and state common law claims under the North Carolina common law of trademarks and the North Carolina common law of unfair competition. All these claims stem from B & W's alleged infringement of Liggett's quality seal ("Q-seal") closure by B & W's oval closure seal.

4. The jury heard evidence and arguments for 115 days, and considered 2,884 exhibits, 85 deposition excerpts, and testimony from 23 live witnesses. The verdict was returned after nine days of deliberations. The court's instructions to the jury on the antitrust claim were generally consistent with the legal position and theory

espoused by Liggett. Some of the same issues and contentions had been considered by the court at summary judgment and/or the directed verdict stage of the trial, and resolved in Liggett's favor. In a complex case such as this, however, development of a complete record is sometimes necessary in order for the court to have a thorough understanding of the issues and facts in controversy. An ever expanding court docket does not always provide an atmosphere conducive to pre-trial analysis of complex economic and legal issues.

5. A different standard applies to a JNOV motion pursuant to Fed.R.Civ.P. 50(b), see infra p. 341, than to a motion for a new trial pursuant to Fed.R.Civ.P. 59, see infra p. 355.

6. A court may in its discretion grant a JNOV motion and deny an alternative motion for a new trial. See Fed.R.Civ.P. 50(c)(1); Stone v. First Wyoming Bank, 625 F.2d 332, 349–50 (10th Cir.1980); Reagin v. Terry, 675 F.Supp. 297, 304–05 (M.D.N.C.1986), aff'd, 829 F.2d 36 (4th Cir.1987). The court's JNOV rulings on competitive injury, causation, and antitrust injury are based upon interpretations of the applicable law. If these interpretations are found to be erroneous and an appellate court applies legal standards more favorable to Liggett, this court does not believe that an examination of the weight of the evidence, the credibility of witnesses, and any alleged errors in the admission or rejection of evidence or instructions to the jury would justify granting B & W a new trial. The only remaining significant issue concerns the sufficiency of Liggett's damage evidence. If antitrust injury is proven, courts are lenient in assessing the proof required to support a damage award. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265–66, 66 S.Ct. 574, 580–81, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563–64, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931). Liggett presented two damage theories and extensive evidence from the testimony of two experts and other witnesses. The court

new trial on the trademark and unfair competition claims will be denied.

## I. FACTS

The cigarette industry in the United States during the mid–1980's provides the setting for this dispute. Six major manufacturers form this industry.[7] Philip Morris and R.J. Reynolds Tobacco Corp. ("RJR") are the industry giants. The other cigarette manufacturers hold substantially smaller market shares. Liggett and B & W compete for wholesale and retail customers across the United States. Both companies sell branded [8] and generic [9] cigarettes. At year-end 1985, B & W's total cigarette sales in the United States were about double Liggett's, although Liggett still sold more generic cigarettes than B & W.

The market shares of both companies have declined in recent years. Since 1975 when its market share was nearly seventeen per cent (17%), B & W's sales have steadily declined. Liggett has had even less success. Years ago, Liggett was a major force in the cigarette industry, enjoying market shares exceeding twenty per cent (20%). However, Liggett's sales declined precipitously for many years. By 1980, Liggett's market share stood at 2.33%, and the company was close to going out of business. Out of desperation, Liggett became the first major cigarette manufacturer to sell generic cigarettes.[10] Liggett encouraged its customers to buy large quantities of generic cigarettes by offering volume rebates so that the more a customer bought the less that customer paid on a per carton basis.

Generic cigarettes were an unqualified success for Liggett. The segment grew steadily, and by mid–1984 generic sales accounted for 4.1% of the total United States cigarette business with Liggett holding ninety-seven per cent (97%) of the segment. The popularity of generic cigarettes attracted other major cigarette manufacturers. In 1983, both RJR and B & W introduced "25's" in response to the success of generic cigarettes.[11] In May 1984, RJR also introduced "branded generics." [12] Later that month, B & W announced it would start selling black and white cigarettes positioned to compete directly with Liggett. B & W offered prospective customers volume rebates similar to Liggett's, only higher. Liggett responded by increasing its volume rebates. The rebate war between

believes there was sufficient evidence to support the jury's damage award.

7. The six major cigarette manufacturers are Philip Morris, Inc., R.J. Reynolds Tobacco Corp., B & W, Lorillard, Inc., American Tobacco Co., and Liggett. A few other domestic and foreign firms have sold cigarettes in the United States during the 1980's, but none has attained any significance in the marketplace.

8. The term "branded cigarettes" describes full-price cigarettes targeted to the image-conscious cigarette consumer. Branded cigarettes are advertised heavily and packaged in containers with distinctive designs. Well-known branded cigarettes include Newport, Pall Mall, Kool, Winston, and, of course, Marlboro—America's most popular branded cigarette by a wide margin.

9. The term "generic cigarettes" refers to a catch-all category of cigarettes priced significantly lower than branded cigarettes. Within this category, sometimes called the price-value category, there are different types of generic cigarettes. This dispute centers around one such type—black and white cigarettes. Black and white cigarettes are sold in plain-looking white packages with black lettering indicating the nature of the product contained within (e.g., "Filter Cigarettes"). These packages look like other generic products on the grocery shelf so that consumers can quickly identify them as lower-priced cigarettes. Another category of generic cigarettes is "branded generics." Branded generics are cigarettes in branded packaging but priced in the black and white cigarette range.

10. Liggett was not the first cigarette company to sell generic cigarettes. Both U.S. Tobacco Co. and G.A. George Georgopulo & Co., smaller cigarette manufacturers with no significant market share, sold generic cigarettes prior to Liggett. However, once Liggett entered the generic category it became the dominant player and was responsible for the segment's initial growth.

11. "Twenty-five's" ("25's") are cigarettes priced and packaged like branded cigarettes but with twenty-five cigarettes contained in each package instead of the standard twenty. RJR introduced Century and B & W introduced Richland as entries in the "25's" category.

12. RJR repositioned Doral, a brand which had previously been unsuccessful competing with other branded cigarettes, by lowering the price

the companies continued for several more rounds. When the dust settled, B & W's published volume rebates were greater than Liggett's published volume rebates.[13] This rebate activity took place before B & W sold its first generic cigarette. B & W began selling generic cigarettes in July 1984, giving rise to this lawsuit in which Liggett alleges that, until the end of 1985, B & W engaged in a predatory pricing campaign designed to "kill" the generic cigarette category.

Today generic cigarettes are a fixture in the cigarette market. Five of the six major cigarette companies have significant entries in the category [14] and growth has been steady. The growth of generic cigarettes has encouraged additional competition, primarily in the form of couponing and stickering,[15] on branded cigarettes.

## II. THE ANTITRUST ISSUES

B & W's JNOV motion may be granted only if, taking all the evidence in the light most favorable to Liggett, there is no substantial evidence to support the jury's verdict. *Evington v. Forbes*, 742 F.2d 834, 835 (4th Cir.1984). Evidence is substantial if it is "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party." *Wyatt v. Interstate & Ocean Transp. Co.*, 623 F.2d 888, 891 (4th Cir. 1980). However, a mere scintilla of evidence is insufficient to sustain a verdict. *Austin v. Torrington Co.*, 810 F.2d 416, 420 (4th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). Therefore, in order to warrant JNOV, B & W must show that Liggett has failed to prove an essential element of its claim.

Liggett's antitrust claim is a private, primary-line,[16] non-geographic [17] Robinson–Patman Act suit. Except for the issue of price discrimination, the jurisdictional elements are undisputed.[18] Despite the connotations of the term "discrimination," there is nothing illegal *per se* about a company discriminating in price. Price discrimination means price difference and nothing more. *See Texaco Inc. v. Hasbrouck*, —— U.S. ——, 110 S.Ct. 2535, 2544, 110 L.Ed.2d 492 (1990). B & W discriminated in price by charging different net prices [19] to different purchasers via volume

to generic levels. Since May 1984, Doral's market share has grown considerably.

13. B & W's published volume rebates from mid-1984 to the end of 1985 ranged from sixty to eighty cents per carton depending on the number of cartons a customer bought from the company. B & W's rebate schedule on a per carton basis was as follows: 60¢ rebate for customers who bought 0–499 cases per quarter; 65¢ rebate for customers who bought 500–999 cases per quarter; 70¢ rebate for customers who bought 1,000–1,499 cases per quarter; 75¢ rebate for customers who bought 1,500–7,999 cases per quarter; and 80¢ rebate for customers who bought 8,000 or more cases per quarter.

14. Lorillard is the only major cigarette manufacturer without a significant presence in the generic cigarette segment.

15. Coupons are a form of price competition in which money-off vouchers on cigarette cartons and packs are distributed to consumers through newspapers and other mediums. Stickering is a form of price competition in which money-off stickers are attached to cigarette cartons, and sometimes even individual packs. Although the list price of couponed and stickered cigarettes does not change, the amount of money the consumer has to pay at the cash register is lessened by the value of the coupon or sticker.

16. In Robinson–Patman Act cases, courts distinguish the probable impact of the price discrimination upon competitors of the seller (primary-line injury), the favored and disfavored buyers (secondary-line injury), or the customers of either of them (tertiary-line injury). *See* 3 E. Kintner & J. Bauer, *Federal Antitrust Law* § 20.9, at 127 (1983).

17. Non-geographic means that the United States is the relevant market as opposed to any particular city, state, or region.

18. The parties do not dispute that at least one of the sales of B & W black and white cigarettes was made across a state line; that each pertinent sale of B & W black and white cigarettes was for use and resale in the United States; that the black and white cigarettes sold by B & W were physical items; that the black and white cigarette sales being compared were made by B & W at about the same time; and that the B & W black and white cigarettes involved in the sales being compared were of like grade and quality.

19. Net price equals list price minus all discounts to the customer.

rebates in actual black and white cigarette transactions. The other elements [20]—competitive injury, causation, and antitrust injury—have been vigorously contested throughout the entire litigation. The court believes that Liggett's evidence falls short in each of these categories.

### A. *Competitive Injury*

The Robinson–Patman Act prohibits only price discrimination the effect of which "may be substantially to lessen competition." 15 U.S.C. § 13(a). This statutory language has been interpreted to proscribe only that price discrimination which has a reasonable possibility [21] of injuring competition in the relevant market. *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288–89, 75 L.Ed.2d 174 (1983). Prior to trial, the parties stipulated that the relevant market in which to examine competitive injury was the entire United States cigarette market. Therefore, Liggett must prove that B & W's price discrimination in the sale of its black and white cigarettes had a reasonable possibility of injuring competition in the United States cigarette market as a whole.

 The competitive injury requirement of the Robinson–Patman Act in the context of this primary-line, non-geographic claim is not fundamentally different from an attempted monopolization claim under Section 2 of the Sherman Act. 15 U.S.C. § 2. Of course, the standards to evaluate competitive injury are different. The Robinson–Patman Act requires a showing of reasonable possibility of injury to competition while the Sherman Act requires a dangerous probability that the attempt to monopolize will be successful. *See Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir.1989). However, this difference affects only the quantum of proof needed to satisfy the respective statute's competitive injury requirements and not the type of evidence which furnishes that proof.[22] In the present case, the court believes that such evidence must consist of predatory pricing practices indicating a reasonable possibility of injury to competition and consumer welfare rather than evidence merely of injury to a competitor combined with bad intent. Absent some objective economic ability to injure competition conduct cannot be illegal no matter what the intent. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–93, 106 S.Ct. 1348, 1356–59, 89 L.Ed.2d 538 (1986); *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1344–45 (8th Cir. 1987).

Liggett fundamentally disagreed with this position at trial and argued numerous times, citing *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), that some showing of injury to a competitor combined with bad intent satisfied the Robinson–Patman Act's competitive injury requirement. This court rejects that position in the context of Liggett's atypical primary-line, non-geographic Robinson–Patman Act claim.

**20.** Antitrust injury is a requirement in all antitrust actions for monetary damages brought by private parties. 15 U.S.C. § 15(a). The other elements of Liggett's claim are part of the Robinson–Patman Act. 15 U.S.C. § 13(a).

**21.** A few courts have used a reasonable probability of injuring competition standard instead of reasonable possibility. *See, e.g., Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29, 35 (7th Cir.1976). This is a distinction of form over substance. *See International Air Indus., Inc. v. American Excelsior Co.*, 517 F.2d 714, 729 (5th Cir.1975) ("any difference between the two formulations is trivial"), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). The Supreme Court in at least one case has used these standards interchangeably. *See*

*Corn Prods. Refining Co. v. FTC,* 324 U.S. 726, 739, 742, 65 S.Ct. 961, 967–68, 969–70, 89 L.Ed. 1320 (1945).

**22.** A noted authority explained the parallel competitive injury requirements of the two statutes this way:

Once a price is shown to be below the relevant costs its effect may be substantially to lessen competition, and it is condemned precisely because it has the potential to destroy competition and, if continued, the dangerous probability of doing so. If the price does not violate the relevant predatory pricing standard, it cannot tend to lessen competition or to have the dangerous probability of doing so. P. Areeda & H. Hovenkamp, *Antitrust Law* 720, at 618 (Supp.1989).

The typical primary-line Robinson–Patman Act case is much different from this one, pitting a small business with a limited product-line which competes only in a single geographic region against a large national manufacturer using predatory pricing tactics to displace the local competitor. *Utah Pie* is just such a case. In *Utah Pie*, several national manufacturers of frozen dessert pies challenged a small, family-operated dessert manufacturer which sold pies in the Salt Lake City area. The national manufacturers' strategy was to lower prices below cost on dessert pies in Salt Lake City, 386 U.S. at 696–97 & n. 12, 698, 701, 87 S.Ct. at 1332–33 & n. 12, 1333, 1335, and run the local competitor out of business. The national manufacturers could afford to do this due to profits obtained on the sale of dessert pies in other areas of the country. The local competitor could sell dessert pies only in Salt Lake City and was faced with the bleak prospect of either lowering prices to unprofitable levels or eventually losing its sales to the low-priced pies. It was in this factual setting that the Supreme Court last addressed the requirements of a primary-line Robinson–Patman Act claim.

Liggett's situation is much different. Liggett, as a national manufacturer of branded and generic cigarettes, is free to compete with B & W in any area of the country over any line of cigarette products and in fact does so. It faces none of the competitive constraints of the local business in *Utah Pie*.[23] In primary-line, non-geographic, predatory pricing cases the Robinson–Patman Act's competitive injury analysis more closely mirrors Section 2 of the Sherman Act than *Utah Pie*. Whether brought under the Sherman Act or the Robinson–Patman Act, predatory pricing is predatory pricing.[24] After all, price cutting is the essence of any predatory pricing campaign and, as the Supreme Court has warned, "mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594, 106 S.Ct. at 1360. Although the Fourth Circuit has not addressed this issue, many other circuits have held that the competitive injury analysis in a predatory pricing case is the same under either the Robinson–Patman Act or Section 2 of the Sherman Act.[25]

That this interpretation of the competitive injury requirement has been widely followed is not surprising since it best comports with basic antitrust principles. The antitrust laws' goal is to promote consumer welfare, not to discourage aggressive price competition. Liggett cannot satisfy the competitive injury requirement by showing simply that it was injured by B & W's price discrimination. Injury to competition occurs only if a competitor is able to raise and maintain prices in the relevant market above competitive levels because this is the only situation where consumer welfare is threatened. So, in order to injure competition via price discrimination in the United

**23.** Because the factual differences between geographic and non-geographic primary-line Robinson–Patman Act claims are so striking, the Third Circuit limited *Utah Pie*'s competitive injury analysis to primary-line, geographic price discrimination cases. *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 351–52 (3d Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982).

**24.** *See* P. Areeda & D. Turner, *Antitrust Law* 720, at 190 (1978) ("The basic substantive issues raised by the Robinson–Patman Act's concern with primary-line injury to competition and by the Sherman Act's concern with predatory pricing are identical.").

**25.** *See McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1493 n. 9 (11th Cir.1988), *cert.* denied, —— U.S. ——, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989); *Henry*, 809 F.2d at 1345; *D.E. Rogers Assocs., Inc. v. Gardner–Denver Co.*, 718 F.2d 1431, 1439 (6th Cir.1983), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1041 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *O. Hommel*, 659 F.2d at 346–47; *Pacific Eng'g & Prod. Co. v. Kerr–McGee Corp.*, 551 F.2d 790, 798 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *International Air*, 517 F.2d at 720 n. 10. *But see A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1404–06 (7th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 528–29 (1st Cir.1989).

States cigarette market, B & W must be able to create a real possibility of both driving out rivals by loss-creating price cutting and then holding on to that advantage to recoup losses by raising and maintaining prices at higher than competitive levels. *See Matsushita,* 475 U.S. at 589, 106 S.Ct. at 1357.

With these principles in mind, there are fatal defects in both Liggett's theory and evidence of competitive injury. Liggett's theory of competitive injury was developed by its expert economist, William Burnett. Burnett concluded that B & W's predatory pricing of black and white cigarettes had a reasonable possibility of injuring competition in the entire United States cigarette market. He based his analysis on numerous B & W internal documents and his study of the structure and history of the cigarette industry. Burnett's theory is quite complicated and requires detailed explanation.

██ Central to Burnett's analysis is that the cigarette market is a highly concentrated oligopoly[26] and that predatory pricing schemes make sense in such markets. The starting point for this analysis is Burnett's opinion that all of the manufacturers in the cigarette industry, including Liggett, enjoy monopoly profits on the sale of their branded cigarettes. He bases this opinion on six factors: (1) the degree of concentration in the domestic cigarette industry; (2) the long-time industry pattern of list-price uniformity and price leadership—that is, when one manufacturer raises the price of its branded cigarette line the others follow and raise their prices to the same level; (3) the relative price inelasticity[27] of cigarette demand; (4) the significant barriers to entry, including large capital costs and the television advertising ban, which prevent new companies from competing with the

major cigarette manufacturers; (5) an analysis of the relationship between cigarette prices and costs which concluded that prices have risen in the industry during a period of declining costs; and (6) the degree to which tobacco industry accounting rates of return exceed those of companies in the domestic food and kindred products industry. Burnett thought this industry structure made it possible for the major cigarette manufacturers to tacitly coordinate[28] their prices at supracompetitive levels.

According to Burnett, B & W engaged in a campaign of predatory pricing against Liggett's black and white cigarettes to protect its monopoly profits on branded cigarettes. Burnett alleged that B & W had great economic incentive to wage such a predatory campaign. His analysis was based on the following factors. First, consumer demand for cigarettes in the United States market was no longer growing and, due to health concerns, was unlikely to grow in the future. Thus, a cigarette manufacturer could increase its market share only at the expense of a rival competitor by getting existing cigarette consumers to switch their brand loyalty. Second, Liggett was a maverick—that is, Liggett was the only major cigarette manufacturer willing to compete for consumers by offering lower prices. Liggett was not worried about its black and white cigarettes cannibalizing its monopoly profits on branded cigarettes because its branded market share was so low. Third, B & W was hurt by Liggett's entry into generic cigarettes more than the other major manufacturers. On a percentage basis, significantly more B & W branded smokers were switching to Liggett generics than were smokers of brands of other manufacturers. As a result, B & W's market share and its alleged

**26.** Oligopoly is the economic term for a market in which few producers are present. There is nothing illegal *per se* about an oligopoly.

**27.** Elasticity means the responsiveness of a dependent variable to changes in a causal factor. Burnett looked at what happened to consumer demand in the cigarette industry when prices rose. He concluded that demand for cigarettes was inelastic because consumer demand did not

decrease very much despite steadily rising prices.

**28.** Burnett does not contend that the major cigarette manufacturers overtly engaged in price-fixing in a smoke-filled room. Instead, he believes the major manufacturers silently agreed that price uniformity was in their best interests and, therefore, priced in lock-step fashion.

monopoly profits were eroding quickly. This erosion gave B & W its incentive to predate.

Burnett testified that B & W came up with an ingenious scheme to kill the generic category and stop losing market share. This alleged scheme is as follows. B & W entered the generic cigarette segment by offering a look-alike black and white package designed to confuse Liggett's existing generic smokers. B & W did not want to fuel consumer demand for generic cigarettes so it focused exclusively on establishing its new business at the wholesale level. B & W captured wholesaler loyalty through significant volume rebates, targeting Liggett's highest volume customers. These rebates made the price of black and white cigarettes to wholesalers well below B & W's average variable cost.[29] B & W encouraged the wholesalers to pocket these rebates instead of passing the savings on to consumers to prevent any new demand for black and white cigarettes.

According to Burnett, B & W's plan was a "win-win/lose-lose" strategy of predation since no matter what Liggett did in response B & W's plan would be successful. Because Liggett had limited financial resources, if it matched B & W's rebates it would have to cut back on its black and white consumer promotional campaign. This cutback in consumer advertising would slow the growth of the generic category and eventually, without advertising, demand for generic cigarettes would decline. If Liggett refused to offer rebates or offered less lucrative deals, its wholesale customers would abandon it in favor of B & W, preventing Liggett from getting its product to the consumer. In a few years, B & W could control prices in the generic cigarette category. Then it would narrow the price gap between branded and generic cigarettes. Price stimulated consumer demand for black and white cigarettes. By raising generic prices, B & W would decrease the relative savings on black and white cigarettes, thus cutting off consumer demand.

Although predatory pricing schemes are typically very costly due to below-cost pricing, Burnett thought B & W's plan was the exception because of simultaneous recoupment.[30] By entering the generic market in the above fashion, according to Burnett, B & W slowed the growth of the generic cigarette segment and thereby slowed the rate at which B & W branded smokers switched to generics. Thus, B & W recovered predatory losses immediately by slowing the loss of sales of its branded cigarettes sold at monopoly prices.

Burnett's theory is buttressed by numerous B & W documents written by top executives. These documents, indicating B & W's anticompetitive intent, are more voluminous and detailed than any other reported case. This evidence not only indicates B & W wanted to injure Liggett, it also details an extensive plan to slow the growth of the generic cigarette segment.[31]

However, despite Burnett's complicated theory and the extensive documentary evidence, Liggett still has not satisfied the competitive injury requirement of the Robinson–Patman Act with any substantial evidence. As a matter of law, B & W could not have had a reasonable possibility of injuring competition unless at the very least it had the realistic prospect of obtaining market power over the generic segment

**29.** Average variable cost equals the sum of all the variable costs divided by output. For a manufacturing firm such as a cigarette company, costs are divided into two categories—fixed and variable. Variable costs fluctuate with a firm's output while fixed costs are independent of output. Variable costs typically include items such as materials, fuel, labor, maintenance, licensing fees, and depreciation occasioned by use. Fixed costs generally include management expenses, overhead, interest on debt, and depreciation occasioned by obsolescence. A price below average variable cost causes a manufacturer to lose money on each unit of output of the product.

**30.** Burnett's only theory of recoupment was simultaneous recoupment. He did not contend that B & W's recoupment would come by raising the price of generic cigarettes.

**31.** Issues of corporate ethics and morality, or the lack thereof, are not appropriate subjects for consideration by the court unless they are also violative of the antitrust, trademark, and unfair competition claims alleged.

of the market[32] and an economically plausible way to recoup its losses.[33]

Market power is "the ability to raise prices above levels that would exist in a perfectly competitive market." *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987). Without the power to control market prices, a firm that raises the price of a product cannot maintain that increase because other firms will offer consumers lower prices, thereby forcing the price-raising firm either to lower prices or lose sales. *See Matsushita*, 475 U.S. at 590–91, 106 S.Ct. at 1357–58 ("petitioners must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices"). An avowed predator with no prospect of controlling prices is a paper tiger unable to harm consumer welfare. Burnett's theory illustrates this point. According to Burnett, for B & W's scheme to succeed it had to raise generic cigarette prices above competitive levels; otherwise, it could not narrow the price gap between branded and generic cigarettes. Without a narrowing of this gap there is no incentive for generic consumers to switch back to their old brands, and B & W's alleged scheme necessarily fails.

■ With at most twelve per cent (12%) of the domestic cigarette market, B & W as a matter of law could not exercise market power unilaterally in either the whole cigarette market or the generic segment. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 119 n. 15, 107 S.Ct. 484, 494 n. 15, 93 L.Ed.2d 427 (1986). Even Burnett conceded this point, admitting that acting alone B & W could not injure consumer welfare by narrowing the price gap between branded and generic cigarettes. However, Burnett argued B & W was not acting unilaterally due to tacit collusion—that is, silent price coordination—among the major manufacturers regarding branded prices. According to Burnett, this tacit collusion effectively gave B & W upwards of ninety-five per cent (95%) of the cigarette market.

Tacit collusion among the major cigarette manufacturers is a dubious theory of market power. In typical cases, market power analysis is straightforward and hinges on whether a company has a large enough market share to control prices in the relevant market. Under this traditional analysis, a company with twelve per cent (12%) of the market cannot have market power.[34]

**32.** Many circuits have held that the competitive injury requirement of the Robinson–Patman Act cannot be satisfied unless the alleged predator has at least a reasonable prospect of obtaining market power. *See Stitt Spark Plug Co. v. Champion Spark Plug Co.*, 840 F.2d 1253, 1255–56 (5th Cir.), *cert. denied*, 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988); *Henry*, 809 F.2d at 1345; *D.E. Rogers*, 718 F.2d at 1436 (quoting *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 [6th Cir.1982] ); *O. Hommel*, 659 F.2d at 348; *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 856 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Pacific Eng'g*, 551 F.2d at 798. A few circuits have been hesitant to apply the market power concept to the Robinson–Patman Act, but this hesitance has always been in the context of geographic price discrimination claims factually distinct from the non-geographic claim alleged here. *See A.A. Poultry Farms*, 881 F.2d at 1404–05; *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 28 (2d Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Lloyd A. Fry Roofing Co. v. FTC*, 371 F.2d 277, 284–85 (7th Cir. 1966). Most importantly, the Supreme Court has indicated that "[t]he success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." *Matsushita*, 475 U.S. at 589, 106 S.Ct. at 1357.

**33.** For a predatory pricing scheme to injure competition the predator must be able not only to recover its initial losses but also harvest some additional gain. *Matsushita*, 475 U.S. at 588–89, 106 S.Ct. at 1356–57. This additional gain is called recoupment, and it is only at the recoupment stage that consumer welfare is injured.

**34.** *See, e.g., United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742 (2d Cir.1989) (no market power with 10% of the local market and 31% of the national market); *Rutman Wine Co. v. E & J Gallo Winery*, 829 F.2d 729, 736 (9th Cir.1987) (no market power with about 33% of the national market and 25% of the local market); *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n*, 745 F.2d 248, 261 (3d Cir.1984) (no market power with 32–35% of the relevant market), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985).

Burnett theorizes, however, that even a relatively small company like B & W can exercise shared market power through tacit collusion with the other major cigarette manufacturers save Liggett. Liggett cites no Robinson–Patman Act or Sherman Act legal precedent which supports this theory of shared market power via tacit collusion. By contrast, the shared market power theory has been rejected several times in the Sherman Act context. *See H.L. Hayden Co. v. Siemens Medical Sys., Inc.,* 879 F.2d 1005, 1018 (2d Cir.1989); *Consolidated Terminal Sys., Inc. v. ITT World Communications, Inc.,* 535 F.Supp. 225, 228–29 (S.D. N.Y.1982); *In re Kellogg Co.,* 99 F.T.C. 8, 260 (1982). Furthermore, one circuit court considering a Section 2 Sherman Act claim frankly acknowledged that there is "no case support" for the shared monopoly theory. *Harkins Amusement Enters., Inc. v. General Cinema Corp.,* 850 F.2d 477, 490 (9th Cir.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989). Finally, a leading antitrust authority has noted that the scenario for predatory pricing by a firm possessing a small share of the market is "highly speculative" and "presses the potential for tacit price coordination very far." P. Areeda & H. Hovenkamp, *Antitrust Law* 711.2c, at 538–39 (Supp. 1989).

Although there is little legal precedent supporting Burnett's shared market power theory, in rejecting it the court need not rule that this theory is insufficient as a matter of law. The only record evidence supporting such a theory was Burnett's opinion testimony which was contradicted by witnesses from the Liggett boardroom. Liggett's most senior executives, including the president of the company, K.V. Dye, unequivocally testified at trial that there was no tacit collusion on branded cigarette pricing decisions, that the cigarette industry has never been a collusive oligopoly,

and that the industry does not reap excessive profits.

Liggett seeks to explain this obvious problem by arguing that the decision-makers at Liggett are not economists and do not understand economic terms such as oligopoly, tacit collusion, and monopoly profits. This argument was considered at the summary judgment stage since these executives gave basically the same testimony at their depositions. The court allowed the case to go to trial in part because the Liggett executives were not economists and in part because of affidavits from the Liggett executives stating that they were confused by the questions asked by B & W lawyers and did not mean to contradict the testimony of Burnett. However, at trial, despite having consulted extensively with Burnett and having had adequate time to familiarize themselves with concepts such as tacit collusion, oligopoly, and monopoly profits, these Liggett executives again contradicted Burnett's theory. The court realizes that at the JNOV stage all reasonable inferences must be given to Liggett, the non-moving party. However, Burnett's expert opinion testimony on these issues cannot be considered substantial evidence sufficient to survive B & W's JNOV motion in light of unequivocal and contradictory trial testimony from the senior executives at Liggett who made the pricing decisions. *See Newman v. Hy–Way Heat Sys., Inc.,* 789 F.2d 269, 270 (4th Cir.1976) (experts may not "speculate in fashions unsupported by, and in this case indeed in contradiction of, the uncontroverted evidence in the case"); *Selle v. Gibb,* 567 F.Supp. 1173, 1182 (N.D.Ill.1983) ("[T]he law does not permit the oath of credible witnesses, testifying to matters within their knowledge, to be disregarded, particularly where lay persons give testimony contradicting existence of the ultimate fact to be inferred from the opinion of an expert."), *aff'd,* 741 F.2d 896 (7th Cir.1984).[35]

---

**35.** *Accord Miller v. FDIC,* 906 F.2d 972, 975 (4th Cir.1990) (plaintiff's contradictory testimony insufficient to create a genuine issue of fact); *Townley v. Norfolk & W. Ry. Co.,* 887 F.2d 498, 501 (4th Cir.1989) (a party may not create an issue of fact by contradicting own testimony);

*Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir.1984) (a party examined at length on deposition cannot raise an issue of fact simply by submitting an affidavit contradicting the prior testimony).

Even if Burnett's opinion testimony on tacit collusion was uncontradicted, competition could not be injured by B & W unless it could raise generic cigarette prices, thereby narrowing the price gap between branded and generic cigarettes. Yet, even Burnett denied there was tacit collusion in the generic cigarette segment. Instead, his theory relied on the supposed motivations of the other major cigarette manufacturers. Burnett contended that there was an alignment of interest among these companies to protect their branded cigarette profits. Thus, they would not disrupt B & W's attempts to slow the growth of the generic segment. If no such alignment of interest existed and any of the other major cigarette manufacturers were interested in promoting the sale of generic cigarettes, even Burnett admitted that successful predation by B & W would be impossible.

No substantial record evidence supports Burnett's alignment of interest theory. Even before B & W began selling black and white cigarettes, RJR· had entered the generic segment by repositioning Doral at generic prices. Burnett conceded that RJR had no anticompetitive intent and that Doral's entry expanded the generic segment. The evidence is uncontroverted that RJR's motive for selling generic cigarettes was to regain its number one position in the cigarette industry from Philip Morris. In order to do this, RJR had to sell a lot of generic cigarettes. Furthermore, there is no evidence that any of the other major cigarette companies had an interest in slowing the growth of generic cigarettes. Today, five of the six major manufacturers sell generic cigarettes in one form or another. Most importantly, in late 1985 B & W tried to raise the price of its generic cigarettes. Neither Liggett nor RJR followed with price increases, and B & W was forced to retract its price increase—exactly what is supposed to happen when a company without market power unilaterally raises its price above competitive levels. Had there been an alignment of interest, RJR would have followed B & W's lead.

■ Not only is there no substantial evidence of market power, the testimony of Liggett's decision-makers that there were no monopoly profits obtained on branded cigarettes and that branded cigarette prices were fair to consumers totally undermines any plausible theory of economic recoupment for B & W. Without some likelihood of recoupment there is no reasonable possibility of injury to competition. Typically, recoupment happens after the predatory objective has been achieved and the predator has the ability to control prices. As explained earlier, Burnett's theory of simultaneous recoupment departed from this model. However, if there were no monopoly profits from branded cigarettes then B & W could not simultaneously recoup its losses from below-cost pricing.

■ Even apart from this testimony, there is another problem with Burnett's recoupment analysis. There is no substantial evidence in the record indicating that wholesalers would not promote the sale of generic cigarettes. Burnett's simultaneous recoupment theory depends on wholesalers pocketing B & W's volume rebates instead of promoting generic cigarettes; otherwise, there is no mechanism to slow the growth of the segment. Yet it makes no sense for wholesalers to pocket all of these rebates. Unlike branded cigarettes, there were no guarantees for wholesalers when they bought B & W's generic cigarettes. If the wholesalers did not sell all the generic cigarettes they bought, they were stuck with the product. B & W's volume rebates were lucrative to them only if they could sell their generic cigarette allotment; otherwise, they lost money. Therefore, there was no alignment of interest between B & W and the wholesalers with respect to generic cigarettes. To the extent that wholesalers wanted to sell generics to consumers, and the only record evidence at trial indicates that they did, B & W could not slow the growth of the category and consumer welfare could not be injured.

■ Similarly, documentary evidence alone is not substantial evidence sufficient to satisfy the competitive injury requirement of the Robinson–Patman Act absent some showing of market power and the possibility of recoupment. *See Henry*, 809

F.2d at 1345. A company with anticompetitive intent cannot injure consumers unless it has at least a reasonable possibility of obtaining market power and recouping its losses. B & W could not achieve either of these objectives and, therefore, it does not matter what the documents say concerning its hopes and plans.

Finally, Liggett did not provide any substantial evidence of actual injury to competition via market analysis. Obviously, without even the realistic prospect of obtaining market power it is impossible for a firm to actually injure competition since prices cannot be increased above competitive levels. Furthermore, even Liggett admits that the generic cigarette segment has grown. Five of the six major cigarette companies have significant entries in the generic category, and growth has increased from about four per cent (4%) when Liggett was alone in the segment to fifteen per cent (15%). The success of generic cigarettes has even encouraged some price competition on branded cigarettes. This court is aware of no Robinson–Patman Act verdict upheld solely on market analysis grounds. Liggett's market analysis evidence is not compelling enough for this court to become the first.[36]

## B. *Causation*

The Robinson–Patman Act is aimed only at price discrimination. Liggett must prove that the reasonable possibility of injury to competition was "the effect of" price discrimination, 15 U.S.C. § 13(a), in order to establish "the necessary causal relationship between the difference in prices and the alleged competitive injury." *Borden Co. v. FTC*, 381 F.2d 175, 180 (5th Cir.1967).[37]

In a typical primary-line Robinson–Patman Act case, the injury alleged is the result of geographic price discrimination. As the Supreme Court has explained, the Clayton Act, as amended by the Robinson–Patman Act, "was born of a desire by Congress to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the competitive position of other sellers." *FTC v. Anheuser–Busch, Inc.*, 363 U.S. 536, 543, 80 S.Ct. 1267, 1271, 4 L.Ed.2d 1385 (1960) (footnote omitted).[38] Proof of causation is straightforward when the price discrimination is geographic. In these cases, a national firm can supplant local competitors confined to a specific geographic market by charging below-cost prices in that market. The local competitor is necessarily limited to competing for customers who can buy at the below-cost price offered by

---

**36.** Much of Liggett's market analysis focuses on the steady decline of the market share of black and white cigarettes. This decline has not injured consumers because of the steady growth of branded generic cigarettes sold at the same price as black and white cigarettes. Overall, the generic segment has grown with consumers preferring branded generic cigarettes to black and white cigarettes. The rest of Liggett's market analysis is equally unconvincing. Liggett contends that B & W caused the price differential between branded and generic cigarettes to decrease. Yet, the percentage price differential has remained about thirty per cent (30%), and B & W quickly retracted the only generic cigarette price increase that it initiated because the competition did not follow. Liggett also alleges that B & W's pricing forced it to reduce its advertising, thereby slowing the segment. Still, the generic cigarette category continued to grow, fueled in part by RJR's aggressive promotion of Doral. Finally, Liggett argues that the military market provides empirical evidence of actual injury to consumers. The generic segment now accounts for over thirty per cent (30%) of the military market, as compared to approximately fifteen per cent (15%) of the civilian market. However, the age, income, and image differences in the military and the civilian sectors make such inferences suspect; the market for generic cigarettes has grown in both sectors; and without any realistic prospect of obtaining market power B & W's conduct cannot be the cause of the different market shares in the two sectors.

**37.** *Accord Stitt Spark Plug*, 840 F.2d at 1257; *Black Gold, Ltd. v. Rockwool Indus., Inc.*, 729 F.2d 676, 680 (10th Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984); *William Inglis*, 668 F.2d at 1040; *Marty's Floor Covering Co. v. GAF Corp.*, 604 F.2d 266, 270 (4th Cir.1979), *cert. denied*, 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980).

**38.** *Accord Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991 & n. 5 (4th Cir. 1990); *O. Hommel*, 659 F.2d at 350; *Marty's Floor Covering*, 604 F.2d at 270; *International Air*, 517 F.2d at 720–21.

the national company. The national firm can subsidize its losses in the local market through profits from sales in other geographic areas. Therefore, since the national firm can remain profitable while the local competitor cannot, the difference between the national firm's below-cost prices and its profitable prices has a reasonable possibility of injuring competition. However, Liggett's primary line, non-geographic claim differs from this scenario, and the geographic causation rationale discussed above has no persuasive force. Both B & W and Liggett competed for generic sales throughout the United States, and Liggett competed in all the markets in which B & W offered the discriminatory prices.

 Because this claim is non-geographic, Liggett has not proven causation by any substantial evidence. The Robinson–Patman Act does not proscribe low prices. B & W's net prices were generally lower than Liggett's at every volume level. Yet, if there was any reasonable possibility of injury to competition from B & W's conduct it came from the low prices that B & W offered to its customers and not from the fact that these low prices varied depending on volume. *See O. Hommel,* 659 F.2d at 350–51 (when price discrimination occurs only in the same geographic market in which the predator and the target compete "[s]elective price-cutting cannot possibly be more harmful to small competitors than a general price reduction to the same level") (quoting Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L. Rev. 697, 725–26 [1975] ).[39]

Even if B & W's low prices created a reasonable possibility of injuring competition by displacing Liggett and making it possible for B & W to raise generic cigarette prices, the fact that those prices varied gave B & W no advantage over Liggett. Liggett was free to compete for sales to B & W's low-volume generic customers, as well as those customers getting the best deals from B & W. Liggett was not excluded from any markets. As a result, Liggett was not disadvantaged any more by B & W's volume rebates than it would have been by one uniform low price. Liggett's complaint is that B & W was selling generic cigarettes for a lower price than it could at all volume levels. Consequently, Liggett has not met its burden of causation because low prices, not price discrimination, provide the only possible linkage to competitive injury.

Liggett disagrees. It contends that the price discrimination was a central component of B & W's predatory plan enabling B & W to make its scheme cost effective and inducing wholesalers to buy generic cigarettes exclusively from B & W. The court will consider these arguments in turn.

Liggett contends that price discrimination made B & W's plan feasible by making it less costly than if B & W offered only one low price. It cites several documents indicating that B & W wanted to "put the money where the volume was." There are no primary-line, non-geographic cases, that this court is aware of, in which cost efficiency satisfied the Robinson–Patman Act's causation requirement. Such an argument if accepted would read any meaningful causation requirement out of the Act. As opposed to one low price set at B & W's high-volume rate, volume rebates certainly saved the company money. However, the same is true of any price discrimination by any firm since price discrimination by definition requires a higher and a lower price. Furthermore, although it may have been more cost efficient for B & W, price discrimination also meant that it would cost less for Liggett to match B & W's prices. Since Liggett and B & W had access to the same customers and markets, B & W could not inflict greater injury on Liggett by charging different prices than by charging a lower uniform price. If Liggett was not injured more by the price discrimination then neither was competition, since Burnett's competitive injury theory hinges on

**39.** *Accord Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 667–68 (2d Cir.1989); *Borden,* 381 F.2d at 180.

B & W replacing Liggett as the generic price leader.

Liggett also argues that B & W's discriminatory rebates encouraged wholesalers to buy generic cigarettes exclusively from B & W. According to Liggett, the volume rebates acted as a magnet enticing customers to buy more B & W generic cigarettes to get to the next rebate level; because higher volume purchases entitled customers to higher discounts, customers opting to allocate a portion of their generic cigarette purchases to Liggett would in effect be penalized; to avoid this penalty customers would buy exclusively from B & W; the more exclusive relationships B & W could cement with former Liggett wholesale customers the faster B & W could displace Liggett and increase generic prices.

Again, Liggett cites no primary-line, non-geographic cases which support its analysis that encouraging exclusivity satisfies the Robinson–Patman Act's causation requirement. Volume discounts do not hurt Liggett, and hence competition, more than any other incentive since both companies compete for the same customers and the same markets. Liggett could respond to B & W's volume rebates by allocating the majority of its own incentives to its high-volume customers, a practice it had followed even before B & W's entry. Furthermore, the only advantage to a wholesaler from getting into B & W's highest volume category is receiving the lowest price available on generic cigarettes. Yet, even at the lowest volume levels, B & W's net prices were below Liggett's, obviously an incentive for a customer to buy only from the manufacturer offering the lowest price on the same product. Therefore, the magnet enticing customers to buy generic cigarettes exclusively from B & W was that B & W's net prices were below Liggett's at every volume level and not that B & W's competitive offer to customers took the form of volume rebates.

### C. *Antitrust Injury*

In a private treble damage action brought under Section 4 of the Clayton Act,[40] there is an additional causation requirement—antitrust injury. Not only must Liggett prove that B & W's price discrimination had a reasonable possibility of injuring competition, Liggett also must prove that B & W's price discrimination caused its complained-of damages.

A private plaintiff like Liggett may not recover damages simply by showing "injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Instead, Liggett must prove it was injured by conduct violating the Robinson–Patman Act. *See* 15 U.S.C. § 15(a). That is, Liggett must prove the existence of " 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Allegheny Pepsi–Cola Bottling Co. v. Mid–Atlantic Coca–Cola Bottling Co.,* 690 F.2d 411, 414 (4th Cir.1982) (quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697–98). Therefore, Liggett cannot recover damages unless it is "able to show a causal connection between the price discrimination in violation of the Act and the injury suffered." *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969).

█ Subsequent to the completion of this trial, the Supreme Court decided a case clarifying the requirements of antitrust injury. The Supreme Court held:

> Antitrust injury does not arise for purposes of § 4 of the Clayton Act until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct; in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do

---

**40.** Section 4 of the Clayton Act is a remedial provision that makes treble damages available to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a).

not threaten competition. Hence, they cannot give rise to antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.,* — U.S. —, 110 S.Ct. 1884, 1892, 109 L.Ed.2d 333 (1990) (citations and footnotes omitted). In the context of the present case, *Atlantic Richfield* makes clear that only evidence of predatory pricing is sufficient to prove antitrust injury. Neither incriminating documentary evidence nor an allegedly distorted market proves antitrust injury unless accompanied by proof of predatory pricing. *Id.* 110 S.Ct. at 1891 n. 7 ("a firm cannot claim antitrust injury from nonpredatory price competition on the asserted ground that it is ruinous").

Liggett, of course, disagrees with this interpretation of *Atlantic Richfield,* arguing that the Supreme Court's antitrust injury analysis applies only to vertical maximum resale price-fixing cases and that the decision illustrates only that Sherman Act principles are different from Robinson–Patman Act principles. It cites as proof the fact that the Supreme Court in *Atlantic Richfield* did not dismiss the Robinson–Patman Act claim since it was "misconduct not relevant here." 110 S.Ct. at 1887. In *Atlantic Richfield,* plaintiff sued defendant under various legal theories including the Sherman Act, the Robinson–Patman Act, and state law unfair competition statutes. Defendant moved for summary judgment on the Section 1 Sherman Act claim and the district court granted the motion. On appeal, both the Ninth Circuit and the Supreme Court considered only the issue of whether dismissing plaintiff's Section 1 Sherman Act claim was proper. The Robinson–Patman Act claim was not relevant to the Supreme Court's decision because that claim was not before it. This language of the Supreme Court cannot be construed to mean that antitrust injury principles under the Robinson–Patman Act are fundamentally different from those under the Sherman Act.

Liggett's interpretation of *Atlantic Richfield* is legally insupportable for several reasons. First, Liggett alleges a primary-line, non-geographic Robinson–Patman Act claim analytically similar to a Section 2 Sherman Act attempted monopoliza-

tion claim. The goal of both statutes is to maximize competition. Second, Liggett's interpretation is anticompetitive since it protects Liggett from non-predatory price competition by B & W despite the fact that such activity cannot injure competition. In *Atlantic Richfield,* the Supreme Court reiterated that "'cutting prices in order to increase business often is the very essence of competition,'" *id.* at 1891 (quoting *Matsushita,* 475 U.S. at 594, 106 S.Ct. at 1360), and Liggett has provided no theoretical justification for distinguishing between straight price cuts and volume rebates. Also, the Supreme Court has held on numerous occasions that the Robinson–Patman Act should be conformed if at all possible to the standards governing the other antitrust laws. *See Great Atl. & Pac. Tea Co. v. FTC,* 440 U.S. 69, 80, 99 S.Ct. 925, 933, 59 L.Ed.2d 153 (1979); *United States v. United States Gypsum Co.,* 438 U.S. 422, 458–59, 98 S.Ct. 2864, 2884–85, 57 L.Ed.2d 854 (1978); *Automatic Canteen Co. v. FTC,* 346 U.S. 61, 63, 73 S.Ct. 1017, 1019, 97 L.Ed. 1454 (1953). Third, Section 4 of the Clayton Act, 15 U.S.C. § 15(a), provides the antitrust injury standard for both the Sherman Act and the Robinson–Patman Act. It would be odd indeed to interpret the same language of Section 4 one way under the Sherman Act and another way under the Robinson–Patman Act. Fourth, and most importantly, Liggett's interpretation requires this court to ignore the plain language of *Atlantic Richfield* in which the Supreme Court clearly stated that non-predatory pricing behavior cannot give rise to antitrust injury "regardless of the type of antitrust claim involved." 110 S.Ct. at 1892.

■ Liggett also argues that *Atlantic Richfield* does not apply to Robinson–Patman Act claims because it is price discrimination rather than predatory prices which must cause the antitrust injury. Liggett's position is correct as far as it goes. In Robinson–Patman Act cases the price discrimination must be linked with the antitrust injury. However, this does not mean that predatory pricing is not relevant. For that position to have merit there would

have to be some anticompetitive aspect of price discrimination other than the fact that one or all of the prices charged were predatory. Yet, the only anticompetitive aspect to B & W's volume rebates is that they were allegedly below cost. Burnett's theory is that B & W's below-cost, volume rebates were designed to drive Liggett out of the generic cigarette segment. The below-cost aspect of these rebates was crucial since this forced Liggett to either lose money on the sale of generic cigarettes or lose customers to B & W. For these reasons this court is convinced that in a primary-line, non-geographic price discrimination case predatory pricing is the only type of evidence which satisfies the antitrust injury requirement.

The court must examine whether Liggett has presented any substantial evidence of antitrust injury. The Supreme Court has stated that "predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill*, 479 U.S. at 117, 107 S.Ct. at 493. But the Court has never defined what "cost" is relevant. *Id.* at 117 n. 12, 107 S.Ct. at 493 n. 12. Given this Supreme Court guidance, most circuits presume that pricing below reasonably anticipated marginal cost is predatory.[41] Because marginal costs cannot be determined easily from conventional accounting methods, average variable cost is used as a surrogate. Most cases of predatory pricing focus on average variable cost evidence, and this one is no different.[42]

Liggett's predatory pricing evidence consisted of expert testimony that B & W priced its generic cigarettes below average variable cost. B & W countered with its chief financial officer who admitted that B & W lost money on the sale of generic cigarettes but stated prices were never below average variable cost. He explained that most companies lose money when they introduce a new product and that there was nothing exceptional about that. Furthermore, he stressed that B & W's overall line of cigarettes—generic plus branded—was very profitable.

■ In order to evaluate Liggett's predatory pricing evidence, this debate need not be resolved. The court believes that Liggett's predatory pricing evidence must show that B & W lost money in the relevant market stipulated to by the parties prior to trial—the market for all cigarettes in the United States. Liggett has not and cannot do this. The evidence is uncontroverted that B & W made money on its overall cigarette sales—branded and generic—during the alleged predatory period.

The parties have stipulated that the relevant market is the entire cigarette market in the United States. Upon close examination, this court believes that there is no substantial economic evidence that generic cigarettes are sufficiently distinct from branded cigarettes to justify applying the average variable cost test to generic cigarettes alone.[43] Markets are determined by the substitutability of goods, and market definition turns on these goods' cross-elasticity of demand and supply. Cross-elastic-

**41.** *See, e.g., Northeastern Tel. Co. v. AT & T Co.,* 651 F.2d 76, 88 (2d Cir.1981) (citations collected therein), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

**42.** This court used average variable cost because Liggett's evidence of predatory pricing centered on this measure; average variable cost is a conservative measure unlikely to penalize the competitive pricing activities of a more efficient competitor; and many circuits use some variant of the average variable cost test to isolate predatory pricing.

**43.** Since Liggett and B & W are full-line competitors who compete for market share across all cigarette product lines, this court instructed the jury that they could consider Liggett's below-

cost pricing evidence only if they determined that generic cigarettes formed a well-defined submarket based on the practical indicia test of *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). The court used this concept to aid the jury in determining whether generic cigarettes were sufficiently distinct from branded cigarettes to justify applying the average variable cost test to generic cigarettes, and not as a means of deciding the appropriate market in which to evaluate competitive injury. If there are no significant economic differences between the two products there is no reason to analyze their price-cost relationship separately.

ity of demand is the extent to which products are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Cross-elasticity of supply is "the capability of other production facilities to be converted to produce a substitutable product." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). There is obviously high cross-elasticity of demand between branded and generic cigarettes. In fact, Liggett's theory hinges on consumers substituting generic for branded cigarettes because the alleged reason for predating was that B & W branded smokers were switching to Liggett's generic cigarettes. There is also high cross-elasticity of supply between branded and generic cigarettes because the same machines that make branded cigarettes can easily produce generic cigarettes.

■ Because there is no question that generic and branded cigarettes compete with each other for the favor of consumers, there is no economic justification for analyzing one separately from the other. Where there is nothing economically distinct about a particular product line, the average variable cost test should not be applied to it. Dr. Philip Areeda, one of the fathers of that test, explains that where the predator and the target sell the same line of products the average variable cost test should be applied to an alleged predator's entire product line instead of to a

particular product because "rivals generally can hardly be ruined so long as prices for the product line as a whole are compensatory." P. Areeda & H. Hovenkamp, *Antitrust Law* 1715.1a, at 592 (Supp.1989). Numerous courts, in cases like this one where the parties are full product line competitors, have refused to apply the average variable cost test to a single product line because there could be no competitive injury in the relevant market even if that product line was priced below cost.[44]

During the alleged predatory period, Liggett and B & W were both profitable, full product line competitors with access to the same customers and markets. Due to these facts, applying the average variable cost test solely to B & W's generic cigarettes would be inappropriate. An examination of price-cost relationships should be made only in reference to the dangers posed by predatory pricing. *Henry*, 809 F.2d at 1344 ("the issue of 'predatory intent' should focus on what the defendant did and whether it could lead to the evil feared"). Under Liggett's theory, the danger posed by B & W's predatory pricing was that B & W would obtain control of the generic segment, raise prices, and thereby kill-off the only low-price alternative to branded cigarettes to the disadvantage of consumers. Even assuming that this danger was real, consumer welfare could not be injured if Liggett responded by switching emphasis to its line of branded cigarettes and decreasing their price, thus charging consumers a fair price instead of a monopolistic one. This would prevent injury to both Liggett and the consumer. Liggett's market share would increase to

**44.** *See Morgan v. Ponder*, 892 F.2d 1355, 1361–62 (8th Cir.1989) (court refuses to apply a price-cost test solely to legal advertising as opposed to all commercial advertising); *Stitt Spark Plug*, 840 F.2d at 1256–57 (a relevant predatory pricing analysis must include defendant's entire line of spark plugs and not just its original equipment line); *Directory Sales Management Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 614 (6th Cir. 1987) (although a telephone company gave away free first listings in its telephone book, they engaged in predatory pricing only if their "overall charges for advertising space in their yellow pages are priced below cost"); *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 597–98 (8th Cir.1987),

*cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988) (court refused to apply below-cost pricing test to only four of the 180 common items that competing specialty food stores sold); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 305 (5th Cir.), *cert. denied*, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984) (where both parties are full-line competitors, 32-ounce bottles not a relevant product to apply average variable cost test to); *Janich Bros.*, 570 F.2d at 856 (half-gallon containers of gin and vodka are not relevant products for predatory pricing analysis); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F.Supp. 1196, 1228 (W.D.N.C.1988) (three-liter bottles not a relevant product for predatory pricing analysis).

offset its lost monopoly profits and consumers would still have a low-price cigarette alternative. Furthermore, B & W could not recoup if Liggett decreased branded prices because cost-conscious consumers would switch to the low-price Liggett brands instead of other branded cigarettes priced at monopoly rates. If the average variable cost test is applied solely to generic cigarettes and antitrust injury is inferred from this below-cost pricing, then Liggett is unjustly rewarded for failing to compete on price with its branded cigarettes. Under this scenario, Liggett's antitrust injury would come from its unwillingness to charge a competitive price for its branded cigarettes and not from B & W's price discrimination. Since Liggett has failed to introduce substantial evidence of predatory pricing to meet the antitrust injury requirement, this provides another ground for granting B & W's JNOV motion.

### III. THE TRADEMARK ISSUES

Liggett has made a motion for a new trial pursuant to Rule 59, Fed.R.Civ.P., on the trademark and unfair competition claims arising from B & W's alleged infringement of Liggett's quality seal trademark. Liggett contends that the court should order a new trial on these issues because (1) the jury verdict was clearly against the weight of the evidence, (2) B & W repeatedly relied upon prejudicial, inadmissible, and improper evidence which tainted the jury process, and (3) Liggett was precluded from using evidence which could have countered B & W's prejudicial and misleading arguments. The court finds these contentions to be without merit, and Liggett's motion will be denied.

■ A motion for a new trial is governed by a different standard than a JNOV motion. *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 594 (4th Cir.1985), *modified on other grounds*, 788 F.2d 1042 (4th Cir.1986). Recently, the Fourth Circuit has reiterated the trial court's duty in ruling on a Rule 59 motion for a new trial. In *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir.1989), the court explained that:

> Under Rule 59 of the Federal Rules of Civil Procedure, a trial judge may weigh the evidence and consider the credibility of the witnesses and, if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial.

*See also Wyatt*, 623 F.2d 888, 891–92; *Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir.1959). A new trial may also be granted if the court believes it has erred in the admission or rejection of evidence, or improperly instructed the jury. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).

To establish trademark infringement a plaintiff must prove that there is a "likelihood of confusion" between its mark and the defendant's mark. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984). Both parties presented evidence from which a reasonable jury could have found in favor of that party on the trademark and unfair competition issues. The jury ruled for B & W. From the evidence introduced on the seven likelihood of confusion factors outlined in *Pizzeria Uno*,[45] the verdict cannot be considered contrary to the clear weight of the evidence.

■ The cornerstone of Liggett's position is its contention that B & W's stipulation of the validity of Liggett's quality seal trademark precluded any evidence or argument by B & W that consumers were not aware of the quality seal. Liggett couples this argument with the contention that B & W's repeated references to the results of Liggett's Conway Milliken Report, a telephone survey of consumers conducted by Liggett, as proof of lack of consumer recognition of the quality seal, were improper

---

**45.** The seven factors are: (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods/services identified by the marks; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; (7) actual confusion.

and contrary to the court's *in limine* ruling.

Liggett's contention that the stipulation of validity of the quality seal trademark precluded evidence and argument by B & W that most consumers were not aware of the mark is contrary to the position taken by Liggett's counsel at trial. Liggett's counsel conceded on the record at the charge conference that the strength of the mark was a question for the jury, that B & W could argue that it was not recognized, and that Liggett could argue that it was recognized. Evidence of the extent of consumer awareness of a mark obviously helps a jury determine the scope of protection to be afforded the mark. However, the court clearly instructed the jury that Liggett had valid federal trademark registrations for the quality seal and that the jury must accept the quality seal as a valid trademark.

Furthermore, Liggett's argument that the stipulation of validity precludes evidence that consumers were not aware of the mark is simply not the law. *See Miss World (U.K.) Ltd. v. Mrs. America Pageants*, 856 F.2d 1445, 1449 (9th Cir.1988) ("[A]n incontestable status does not alone establish a strong mark."); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir.1986) (incontestable status does not preclude defendant from arguing mark is weak and not infringed; "Incontestable status does not make a weak mark strong."), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *see also Munters Corp. v. Matsui America, Inc.*, 730 F.Supp. 790, 795–96 (N.D.Ill.1989), *aff'd*, 909 F.2d 250 (7th Cir.1990); *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 121 (S.D.N.Y.1989); 2 J. McCarthy, *Trademarks and Unfair Competition* § 32:44D (2d ed. 1984 & Supp.1989).

Liggett's emphasis on B & W's questions to witnesses and arguments about Liggett's Conway Milliken study is also misplaced. The court explained on numerous occasions during the trial that Liggett's extensive testimony and evidence concerning the promotion of its quality seal opened the door to cross-examination and evidence of the effectiveness of that promotion. The court then allowed Liggett to present additional evidence about what the study was designed to determine, how it was conducted, and the significance of the results. Furthermore, Liggett's counsel had ample opportunity in closing arguments to counter any arguments by B & W's counsel concerning the significance of the Conway Milliken Report.[46]

Liggett's other arguments concerning the use of prejudicial, inadmissible, and improper evidence are based almost exclusively on B & W's closing argument. However, Liggett failed to object during closing argument to most of the statements which it now claims were so prejudicial as to warrant a new trial. The Fourth Circuit has emphasized that "[i]t is the universal rule that during closing argument counsel ' "cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." ' " *Dennis v. General Elec. Corp.*, 762 F.2d 365, 366–67 (4th Cir.1985) (quoting *United States v. Elmore*, 423 F.2d 775, 781 [4th Cir.], *cert. denied*, 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 [1970], and *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 851–52, 84 L.Ed. 1129 [1940] ). Liggett had every opportunity in its rebuttal argument to clarify any arguments which it believed were misleading on the part of B & W. The alleged improprie-

**46.** Liggett also contends that B & W improperly took advantage of the court's pre-trial rulings which prevented Liggett from calling consumers who had confused B & W's black and gold lion closure seal, a seal which was not the basis of Liggett's claim in this case, with the Liggett quality seal trademark. Liggett further contends that it was tricked or prevented from calling Saul Lefkowitz, a former chairman of the United States Trademark Trial and Appeal Board, who would have testified that registration of the quality seal was proper, a fact B & W conceded. Other proposed testimony by Mr. Lefkowitz sought to instruct the jury on the law, a matter within the province of the court. The court is satisfied that its initial position concerning these witnesses was correct.

ties in B & W's closing argument do not involve any exceptional circumstances which would impair "the public reputation and integrity of the judicial proceeding." *Dennis*, 762 F.2d at 367; *see also Socony–Vacuum Oil*, 310 U.S. at 239, 60 S.Ct. at 851–52.

For the foregoing reasons, Liggett's motion for a new trial on the trademark and unfair competition claims will be denied.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

## ORDER and JUDGMENT

For the reasons set forth in a memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's motion for judgment notwithstanding the verdict pursuant to Rule 50(b), Federal Rules of Civil Procedure, be, and the same hereby is, GRANTED, and that the jury verdict and judgment in favor of the Plaintiff be, and the same hereby is, SET ASIDE, and judgment entered for the Defendant; and

IT IS FURTHER ORDERED that Defendant's alternative motion for a new trial pursuant to Rule 59, Federal Rules of Civil Procedure, be, and the same hereby is, DENIED; and

IT IS FURTHER ORDERED that Plaintiff's motion for a new trial pursuant to Rule 59, Federal Rules of Civil Procedure, be, and the same hereby is, DENIED.